THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                                    Mailed:
March 29, 2012                                         July 23, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

_____

*The Board of Trustees of The University of Alabama and
Paul W. Bryant, Jr.*

*v.*

*William Pitts, Jr. and Christopher Blackburn*

_____

Opposition No. 91187103
Serial No. 77342852

_____

R. Charles Henn, Jr., Alicia Grahn Jones and Nichole Davis Chollet of Kilpatrick Townsend & Stockton LLP for Opposers The Board of Trustees of The University of Alabama and Paul W. Bryant Jr.

Jerry L. Watts of Page, Scrantom, Sprouse, Tucker & Ford, P.C. for Applicants William Pitts, Jr. and Christopher Blackburn.

_____

Before Zervas, Bergsman and Kuczma, Administrative Trademark Judges.

Opinion by Kuczma, Administrative Trademark Judge:

On the field for this contest are a university's alleged common law rights in a crimson and white color scheme, and a houndstooth pattern, versus an application for registration of a trademark that contains the word "houndstooth" and a houndstooth background pattern. The clash finds the University of Alabama, and

Paul W. Bryant, Jr., son of legendary Alabama football coach Paul W. Bryant, a/k/a "Coach Bear Bryant'" ("Coach Bryant"), teaming up as challengers.

William Pitts, Jr. and Christopher Blackburn ("applicants") take the field as joint applicants who have filed a use-based application to register the stylized mark shown below for "shirts, hats" in International Class 25.[1]



Color is not claimed as a feature of the mark and the word "houndstooth" is disclaimed.

The Board of Trustees of the University of Alabama (the "University"), and Mr. Paul W. Bryant, Jr. ("Bryant Jr."), as representative of the estate of Paul W. Bryant ("Bryant's estate"), (collectively "opposers") filed a notice of opposition on

---

[1] Application Serial No. 77342852 was filed under § 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), on December 3, 2007, alleging dates of first use and first use in commerce of September 1, 2007 ("applicants' mark"). The identification of goods in the initial application was: "Pants; Shirts; Shoes; Undergarments." In a March 19, 2008 Response to Office Action, the identification was amended to "shirts; hats." This amendment does not appear to conform to the USPTO's Rules of Practice set forth in 37 C.F.R. § 2.71(a) as "hats" were not included in the original identification of goods and, the signature on the Office Action response does not conform to the requirements in 37 C.F.R. § 2.193(e)(2). Accordingly, pursuant to 37 C.F.R. § 2.131, in the event applicants ultimately prevail in this proceeding, the application will be remanded to the examining attorney for reexamination of the application in light of the foregoing.

October 22, 2008.[2] As their amended grounds for opposition, opposers allege priority and likelihood of confusion under Section 2(d) of the Trademark Act of 1946, 15 U.S.C. §1052(d), based on their longstanding and extensive use of a houndstooth pattern (the "Houndstooth Pattern" mark) that "has come to identify Coach Bryant and the University's goods and educational and athletic services," and a crimson and white color scheme used by the University.[3] Opposers also allege that applicants' mark – due to its inclusion of a pattern as a background for the wording in the mark – references the houndstooth hat worn by Coach Bryant at Alabama football games and that applicants' mark falsely suggests a connection with the University and Coach Bryant and disparages the University and Coach Bryant and brings them into contempt or disrepute under § 2(a) of the Trademark Act, 15 U.S.C. § 1052(a).[4]

---

[2] For purposes of this decision, we treat Bryant Jr. and the estate of Coach Bear Bryant as representing the same legal interests. *See* footnote 47 *infra*.

[3] See First Amended Notice of Opposition ¶¶ 7-11 (Docket # 6) ("Docket #" corresponds to the index number listing indicated in TTABVUE).

[4] Opposers' amended notice of opposition also alleged that applicants' mark was procured by fraud because applicants did not use the mark in commerce in connection with "pants, shoes, and undergarments" as of the filing date of the application and applicants failed to comply with 37 C.F.R. § 2.33(a), which requires that an application must be signed by a person properly authorized to sign on behalf of the applicants. Inasmuch as neither party submitted any arguments related to either of these additional grounds, we deem these grounds to be waived. *See Knight Textile Corp.* v. *Jones Investment Co.*, 75 USPQ2d 1313, 1314 n.4 (TTAB 2005) (where opposer presented no arguments in its brief regarding the claim of dilution, opposer is deemed to have waived the claim). Additionally, applicants' alleged failure to comply with 37 C.F.R. § 2.33(a) is an *ex parte* matter that is not a proper ground for opposition. *See Flash & Partners S.P.A.* v. *I.E. Manufacturing LLC*, 95 USPQ2d 1813, 1816-17 (TTAB 2010); *Century 21 Real Estate Corp.* v. *Century Life of America*, 10 USPQ2d 2034, 2035 (TTAB 1989) and TBMP § 309.03(c) [Note 2] (3d ed. rev. 2 2013).

In their amended answer, applicants responded *pro se* denying the salient allegations, and clarifying that Linda Parkinson Pitts[5] was authorized to act on applicants' behalf in connection with the application. They also admitted that the only goods on which the mark was used were "shirts and hats" which mirror the amendment to the application made on March 19, 2008. At trial and during the briefing period, applicants were represented by counsel.

## A.  Opposers' Motion to Exclude Applicants' Evidence

Applicants introduced websites and Internet search results as evidence of third-party uses of a houndstooth pattern. Opposers have moved to exclude this evidence, contending it is not relevant because it fails to demonstrate the extent of use by the third parties.[6]  Inasmuch as this evidence is relevant to the question

---

[5] Applicant William Pitts, Jr.'s wife, Linda Parkinson Pitts, signed the initial application and the March 19, 2008 Response to Office Action during prosecution of the application. Applicants testified that Mrs. Pitts had authority to act on their behalf. Pitts, Jr. 3/31/09 Dep. pp. 33-37, Exhibits 16 and 17 Opposers' Notice of Reliance ("OPPS NOR") 0252-263. (Docket # 29).

[6] Although opposers identified TBMP § 800-7 as the basis for their motion to exclude submitted with their Trial Brief, there is no such section in the TBMP. However, TBMP § 801.03 permits such evidentiary objections to be raised in an appendix or separate statement of objections to a party's trial brief.  The following evidence is the subject of opposers' motion to exclude: Applicants' NOR Exhibit A (APP NOR 001-014), Exhibit B (pages APP NOR 015-017 and APP NOR 021-025), Exhibit D (pages APP NOR 043-050) and Exhibit H (APP NOR 073-091) (Docket # 34).  Portions of applicants' Notice of Reliance, namely, Exhibit B (pages APP NOR 018-020), Exhibit C (APP NOR 026-042), and Exhibit E (APP NOR 057-58) (Docket # 34), and their Supplemental Notice of Reliance including the Watts, Pitts and Forsythe Declarations (Docket ## 47-50), were stricken in the Board's March 1, 2011 Order.  Accordingly, this evidence has not been considered.

Opposers have not challenged the admissibility of the following exhibits filed by applicants which are in evidence: Applicants' Notice of Reliance Exhibit D (APP NOR pages 051-056), Exhibit F (APP NOR 059-067) and Exhibit G (APP NOR 068-072) (Docket # 34). Additionally, based on our ruling on opposers' motion, applicants' following exhibits are also admitted into evidence: Applicants' Notice of Reliance Exhibit A (APP NOR 001-014), Exhibit B (APP NOR 015-016, 021-025), Exhibit D (APP NOR 043-050), and Exhibit H (APP NOR 073-091) (Docket # 34).

whether opposers have shown acquired distinctiveness in their alleged Houndstooth Pattern mark, opposers' motion is denied.

As discussed more fully in Section E.3(a) below, because opposers assert trademark rights in the unregistered Houndstooth Pattern mark, which is not inherently distinctive, they bear the burden of proving that their alleged mark has acquired distinctiveness. *Otto Roth & Co., Inc.* v. *Universal Foods Corp.*, 640 F.2d 1317, 1320, 209 USPQ 40, 43 (CCPA 1981) and 2 J. Thomas McCarthy, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs ᴀɴᴅ Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ § 15:32 (4th ed. June 2013) (the burden of proof of acquired distinctiveness is upon the party trying to establish legal protection for the mark). To the extent applicants' third-party evidence shows use of a houndstooth pattern for goods similar to those sold by opposers, it challenges the existence of acquired distinctiveness in the alleged Houndstooth Pattern mark.

Applicants' third-party evidence consisting of website excerpts featuring houndstooth products offered for sale online is clearly admissible. Unlike the third-party registrations criticized in *Scarves by Vera, Inc.* v. *Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173, 192 USPQ 289, 294 (2d Cir. 1976), cited by opposers, applicants' website excerpts evidence actual promotion and use of a houndstooth pattern to sell products online.

The *TriStar* case cited by opposers notes one way applicants can prove opposers' alleged Houndstooth Pattern mark was not used exclusively, specifically, by showing third-party uses that compete with opposers' mark, and that third-party uses of the mark were "well promoted" or that the third parties' marks were

5

"recognized by consumers." *Tri-Star Pictures, Inc.* v. *Unger*, 14 F.Supp2d 339, 353, (S.D.N.Y. 1998), *quoting Scarves by Vera*, 192 USPQ at 1173.

The context of applicants' third-party evidence demonstrates its relevance. The website *ehoundstooth.com* contains images of products covered with houndstooth patterns offered for sale on the same page (APP NOR-003) as products bearing the University's "Stylized A logo." The "About Us" page at *houndstoothhut.com* (APP NOR 005-012) states that it launched in 2007 with the intention of "designing and distributing houndstooth products for Alabama fans! . . . operates a game day location . . . during all University of Alabama home games. Our products are distributed . . . through out [sic] the state of Alabama. Houndstooth Hut has quickly become the number one distributor of original houndstooth designs for Alabama fans." This site offers houndstooth products as well as items targeted to Alabama fans including books about Coach Bear Bryant and Alabama SEC Champion t-shirts. The *crimsonhoundstooth.com* site (APP NOR 013-014) offers Alabama t-shirts, and t-shirts bearing an image of a patterned fedora,[7] identifying its physical address at Crimson Houndstooth, in Anniston, Alabama.

To the extent applicants' third-party Internet evidence indicates that products bearing a houndstooth pattern are offered for sale and marketed in the

---

[7] Fedora: *n.* a soft felt hat with a curled brim, worn with the crown creased lengthwise. [1885-90, Amer.; said to be named after Fédora, play by Victorien Sardou (1831-1908)]. *The Random House Dictionary of the English Language*, Second Edition. Unabridged. 1987. The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac* v. *J.C. Gourmet Food Imp. Co.,* 213 USPQ 594, 596 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

same channel of trade as opposers' products, i.e., in Alabama and via the Internet, to the same types of customers, i.e., to fans of the University or its football team, and in connection with domain names containing the word "houndstooth," the evidence is relevant to show third-party use.[8] *Cf. Palm Bay Imports Inc.* v. *Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1693 (Fed. Cir. 2005) (probative value of third-party trademarks depends on usage; probative value of Beverage Media Guide distributed to trade was minimal because it did not evidence consuming public's awareness that term was used for other products). Because the products shown in the third-party websites are the type of products sold by the University online, there is at least a reasonable likelihood that they would be sought after and found on such websites by fans of the University. Where, as here, the third-party uses consist of websites selling competitive products, they evidence public awareness of houndstooth patterns originating with parties other than opposers and are probative of the lack of acquired distinctiveness in opposers' alleged Houndstooth Pattern mark. *See In re Reed Elsevier Properties*

---

[8] Applicants' evidence shows the URL (i.e., Internet address) of the document and the date the document was printed. Printouts of Internet webpages may be made of record by notice of reliance, without requiring the testimony of the witness printing out the webpages to introduce and authenticate them. *See Safer Inc.* v. *OMS Investments Inc.*, 94 USPQ2d 1031, 1039 (TTAB 2010). Internet evidence, similar to printed publications, is only admissible for what it shows on its face. Because applicants' submission does not fall within an exception to the hearsay rule, it will not be considered to prove the truth of any matter stated therein. *See, e.g.*, *7-Eleven Inc.* v. *Wechsler*, 83 USPQ2d 1715, 1717 n.2 (TTAB 2007) (materials made of record by notice of reliance under 37 C.F.R. § 2.122(e) not admissible for the truth of the matters contained therein, unless a competent witness has testified to the truth of such matters); *Midwest Plastic Fabricators Inc.* v. *Underwriters Laboratories Inc.*, 12 USPQ2d 1267, 1270 n.5 (TTAB 1989) (annual report in evidence only for what it showed on its face), *aff'd*, 906 F.2d 1568, 15 USPQ2d 1359 (Fed. Cir. 1990). Thus, the websites are probative evidence that the websites exist and offer the products for sale.

*Inc.,* 482 F.3d 1376, 1380, 82 USPQ2d 1378, 1381 (Fed. Cir. 2007) (third-party websites are competent sources to show likely perception of website content).

In view of opposers' asserted rights to the Houndstooth Pattern mark on all products sold in Alabama,[9] the pages from the *houndstoothsportsbar.com* website (APP NOR 021-025) are also admissible. The site, which advertises a sports bar and features a cartoon-like logo of a dog sitting in a dog house wearing a houndstooth patterned hat, offers apparel items bearing the dog logo for sale. The site contains references to the "Alabama Crimson Tide" (a nickname for the University) and contents of the site indicate the bar is located in Tuscaloosa, Alabama, the same city where the University is located. Similarly, the page from *varsityvests.com* (APP NOR 050) is admissible to show that garters identified as "University of Alabama Houndstooth Garter" in a houndstooth pattern are being offered for sale on the Internet and are targeted to Alabama fans.

Collectively, these sites are relevant because they serve to indicate that houndstooth products are available for purchase on the Internet and targeted to fans of the University. The absence of information as to whether the sites were well promoted or highly visited, or how consumers actually perceived the sites, is something that we take into consideration in ascertaining the weight to be given to such evidence.

Opposers also object to the printouts of blog excerpts (APP NOR 073-086) and Internet search results for the term "houndstooth mafia" (APP NOR 087-091) on the

---

[9] See Opposers' Trial Brief p. 9, fn. 3.

same grounds raised for the foregoing websites. The blog excerpts and search results are relevant to show third-party use and public perception of the term "houndstooth mafia," and are therefore admissible.[10]

Lastly, opposers object to applicants' Exhibit B (APP NOR 015-020) which consists of pages from the *houndstoothcondos.com* website and a document entitled Condominium Purchase Contract. While the webpages are admissible, there is no showing that the Condominium Purchase Contract is admissible as a publicly available printed publication or as obtained from a website. Accordingly, the Contract (APP NOR 018-020) has not been considered. *See* 37 C.F.R. § 2.122(e) and TBMP § 704.08(a) (3d ed. rev. 2012).

B. **The Record**

The Appendix to this decision lists the contents of the entire record in this case. We have carefully considered all of the parties' arguments and evidence in the record, even if not specifically discussed herein, and our findings of fact are based on such evidence.

---

[10] While Internet search results frequently do not provide sufficient probative information, they are admissible to the extent applicant Pitts testified as to his familiarity with, and his postings on, some of the websites identified in the search results. (Pitts, Jr. 3/21/2011 Dep. pp. 47-53, Docket # 59). We consider the absence of evidence as to the extent of distribution of this web material, and the extent of participation reflected in these blogs, in determining the weight to be accorded this evidence.

Opposers also object to this evidence on the ground that it was not cited in Applicants' Brief. This evidence was properly filed via a notice of reliance and is relevant to the arguments made at pages 5 and 35 of Applicants' Brief.

## C. Findings of Fact

### 1.    Opposers

Located in Tuscaloosa, Alabama, the University of Alabama was founded in 1831 and, in recent years, has been ranked as one of the nation's top 50 public universities by *US News & World Report*.  The University has an expansive sports program and is a member of the National Collegiate Athletic Association and the Southeastern Conference ("SEC").  Over the years, the University's football teams have won thirteen national championships,[11] twenty-one conference championships, and participated in more than 57 college football bowl games.[12] The University has utilized a crimson and white color scheme for more than 100 years in connection with its sports teams, promotional materials, and collateral products and began licensing its crimson and white color scheme as early as 1984.[13]

Paul "Bear" Bryant, the legendary coach of the University's football team from 1958-1982, retired from coaching at the University having more than 320 wins, at the time, the most wins of any major college football coach, including six national championships, and an unprecedented thirteen conference championships.

---

[11] We take judicial notice that the University's football teams have now won an impressive fifteen national championships.

[12] Gaston Testimony Dep. pp. 9-12 (Docket # 37).

[13] Gaston Testimony Dep. pp. 25-32 (Docket # 37), Exhibits 28-39 OPPS' NORT 0912-1003 (Docket ## 38-39) [Note:  NORT is the abbreviation utilized by opposers to identify deposition testimony and accompanying exhibits that were filed via a Notice of Filing of Testimony]; Drucker 5/20/10 Dep. p. 18-19 (Docket # 41).

He was named National Coach of the Year three times and SEC Coach of the Year eight times.[14]

During most football games from 1964-1982, many of which were televised nationally, and at public appearances on behalf of the University, Coach Bryant wore patterned fedora hats that included houndstooth, plaids and checkered fabric designs. He appeared on the cover of national magazines and in newspaper articles published across the country wearing fedoras of houndstooth and non-houndstooth fabric patterns.[15]

Coach Bryant's legacy has been memorialized at the University by, *inter alia*, the renaming of the University's stadium to Bryant-Denny Stadium, naming of an athletic dormitory and a continuing education conference center after Coach Bryant, placement outside the Stadium of a statue of the Coach wearing a patterned fedora hat, and establishing the Paul W. Bryant Museum honoring Coach Bryant, utilizing a logo for the Museum that includes Coach Bryant wearing a patterned fedora.[16]

---

[14] Bryant, Jr. Testimony Dep. pp. 8-10. (Docket # 35); Gaston Testimony Dep. pp. 17-18 (Docket # 37).

[15] Bryant, Jr. Testimony Dep. pp. 10-11 (Docket # 35). Although Bryant, Jr. and other witnesses testified that Coach Bryant wore a houndstooth hat, clearly some of the hats worn by Coach Bryant and pictured in the evidence were not houndstooth (see definition and image of "houndstooth" in section E.3(a) below). *See e.g.*, Bryant, Jr. Testimony Dep. Exhibit 81 OPPS' NORT 1602, 1605, 1611, 1612, 1618, 1621 (Docket # 35); Gaddy Testimony Dep. Exhibit 52 OPPS' NORT 1209, 1218, 1224, 1229, 1238, 1240-1242, 1247, 1248, 1255, 1256, 1262-1264, 1269, 1270, 1274, 1280, 1281, Exhibit 53 OPPS' NORT 1288, 1292, 1293, 1300, Exhibit 59 OPPS' NORT 1317, 1319, Exhibit 62 OPPS' NORT 1323, Exhibit 65 OPPS' NORT 1331 (Docket # 36) and Blackburn 3/31/09 Dep. Exhibit 4 OPPS' NORT 138, 140-142 (Docket # 29).

[16] Bryant, Jr. Testimony Dep. pp. 13-14 (Docket # 35); Gaddy Testimony Dep. p. 17 (Docket # 36); Gaston Testimony Dep. p. 22, Exhibit 20 OPPS' NORT 495 (Docket # 37).

Based on the physical evidence presented, it is not possible to discern whether the fedora hats on the statue and in the Museum logo embody a houndstooth pattern.

The Paul W. Bryant Museum opened on the University's campus in 1988, is owned by the University and is operated in collaboration with Coach Bryant's estate. It is open to the public and the total attendance from the time it opened through July 2009 was in excess of 370,000 visitors.[17] Shortly before its opening in 1988, the Museum began using a logo containing the words PAUL W. BRYANT MUSEUM and a likeness of Coach Bryant wearing a patterned fedora. The Museum logo is used on the Museum's signage, website, promotional materials, and advertising, and on apparel and collateral items, some of which are sold on its website.[18] The Museum offered houndstooth fedoras for sale on its website at least as early as March 27, 2009. A webpage from the Museum's online store dated May 2010 shows a link entitled "Houndstooth Collection" displaying an image of a houndstooth fedora, but there are no images or testimony regarding the meaning of "Houndstooth Collection" or whether products having a houndstooth pattern are sold under that link.[19]

Fifteen years ago, the United States Postal Service issued a commemorative stamp featuring an image of Coach Bryant wearing a patterned fedora.[20] However,

---

[17] Gaddy Testimony Dep. pp. 7-9 (Docket # 36).

[18] Blackburn 3/31/09 Dep. p. 30; Gaddy Testimony Dep. pp. 17-20, Exhibits 49, 65, 68-70, OPPS' NORT 1195, 1330-1333, 1339-1355 (Docket # 36).

[19] Gaddy Testimony Dep. p. 19, Exhibit 67 OPPS' NORT 1338 (Docket # 36).

[20] Bryant, Jr. Testimony Dep. pp. 15-16 (Docket # 35), Gaddy Testimony Dep. pp. 16-17, Exhibit 64 OPPS' NORT 1329 (Docket #36).

the stamps were released only in the state of Alabama and it is unclear whether the pattern shown on Coach Bryant's fedora is in fact houndstooth.

Coach Bryant is well-known in the context of college football for wearing a patterned fedora that is most frequently covered by a houndstooth pattern and the media continued to associate him with a houndstooth hat years after his death in 1983.[21] Fans of the University's football team also associate the houndstooth fedora with Coach Bryant.[22]

---

[21] Blackburn 3/31/09 Dep. p. 27 (Docket # 29); Gaston Testimony Dep. p 22, Exhibit 21 NORT 496-853 (Docket ## 37-38). The articles show that Coach Bryant is well-known for wearing houndstooth fedoras: "[caption] Readily recognizable by his checkered hat, Coach Bryant . . . *Alabama Alumni News* November-December 1973, OPPS' NORT 503-505; "[caption] Bear Bryant was known for winning–and known by his houndstooth-checkered hat." 1/27/83 *Star-News*, Pasadena, CA, OPPS' NORT 537; "Bryant, who made Alabama football and houndstooth check hats famous while winning more games . . ." 12/16/82 *Boston Globe*, OPPS' NORT 583; " . . . when the sight of Bear Bryant's houndstooth hat was enough to make Tide opponents concede." 11/13, 86 *Orlando Sentinel*, OPPS' NORT 602; "No one projected a bigger image than the man in the houndstooth hat." 9/10/87 *Dallas Morning News*, OPPS' NORT 617-618; "Bear Bryant spent 24 years coaching at Alabama, becoming a legend in a houndstooth hat." 3/20/92 *Roanoke Times*, OPPS' NORT 645; "In the Paul W. Bryant Museum, visitors ask to see Bear Bryant's houndstooth, perhaps the most famous hat in football, by name;" [caption] "Coaches such as Tom Landry, right, and Bear Bryant, inset, wore fedoras during the hat's fashion heyday." 1/1/02 *Sarasota Herald Tribune*, OPPS' NORT 704; "Alabama conjures memories of Bear Bryant studying practice from his tower and walking the sidelines in his signature houndstooth hat." 9/6/02 *The Associated Press State & Local Wire*, OPPS' NORT 712; ". . . in the years before Bryant and his houndstooth fedora became college football trademarks." 8/29/04 *San Antonio Express-News*, OPPS' NORT 729; "And Alabama hasn't enjoyed anything resembling consistent dominance since Bear Bryant hung up his houndstooth fedora." 11/16/07 *The Washington Times*, OPPS' NORT 781; "But the six-time national champion football program has long been king at the Southeastern Conference school, where Paul "Bear" Bryant once roamed the sidelines in his trademark houndstooth hat." 3/28/09 *Associated Press Online*, OPPS' NORT 810; "You won't ever catch Saban wearing the houndstooth hat that was the symbol of Alabama's revered icon Paul 'Bear' Bryant." 12/6/09 *Miami Herald*, OPPS' NORT 835.

[22] Bryant, Jr. Testimony Dep. p. 17 (Docket # 35); Gaston Testimony Dep. p. 24 (Docket # 37); Blackburn 3/31/09 Dep. p. 27 (Docket # 29).

Paul W. Bryant, Jr., is the son of Coach Bryant.[23] There is no evidence that Coach Bryant or Bryant, Jr. ever sold items bearing the houndstooth pattern. The University first used a houndstooth pattern in 1983 when it applied stickers bearing a houndstooth pattern to football players' helmets to commemorate Coach Bryant who passed away earlier that year. Two decades later, in the 2006 football game played against "Ole Miss," the University's players wore football jerseys having a houndstooth pattern around the neck opening to commemorate Coach Bear Bryant and these jerseys were offered for sale to the public.[24] In 2009, some of the University's football players wore houndstooth gloves in the Sugar Bowl game.[25] Although the University currently sells a variety of apparel products bearing the houndstooth pattern, it is unclear when it first started selling such products.

The University approved designs for apparel having a houndstooth pattern, submitted by Nike to the University in 2006, and also licensed apparel items with the houndstooth pattern that year.[26] A webpage dated 3/24/09 from the University's website is the earliest evidence of the University offering to sell products bearing the houndstooth pattern. The baseball caps and t-shirts shown on the webpage bear the University's "Stylized A" trademark.[27] By May 2010, the University was

---

[23] Bryant, Jr. Testimony Dep. pp. 16-18 (Docket # 35).

[24] Blackburn 3/31/09 Dep. p. 43 (Docket # 29); Pitts Jr. 3/31/09 Dep. p. 80 (Docket # 29); Gaston Testimony Dep. p. 20 (Docket # 37).

[25] Gaston Testimony Dep. p. 20 (Docket # 37).

[26] Drucker 5/20/10 Dep. pp. 16-17, Exhibit 76 OPPS' NORT 1405-14007 (Docket # 41).

[27] Gaston Testimony Dep. pp. 23-24, Exhibit 24 NORT 862-863 (Docket ## 37, 38); the URL and printed date for the webpage shown in Exhibit 24 are partially obliterated. However, Exhibit 24 appears to be the same webpage as shown in Exhibit 8 OPPS' NOR 146-147 to the Blackburn 3/31/09 Deposition (Docket # 29) which displays the following:

licensing and selling apparel having a houndstooth pattern including t-shirts, sweat shirts, jerseys and various styles of hats and caps.[28] All of the houndstooth apparel items shown in the evidence bear some indicia of the University such as its "Stylized A," "Alabama," "Bama," or "Crimson Tide" trademarks. The University sells its licensed apparel online, on eBay, at local shops and nationwide retail outlets, and at locations near the University's stadium during its football games.[29]

## 2. Applicants

Applicants are fans of the University and Coach Bryant and have attended numerous football games at the University.[30] Applicant Blackburn owns a custom embroidery shop and applicant Pitts, Jr. is a sergeant with the Phenix City (Alabama) Fire Department. Applicants entered into a "handshake deal" with each other to sell products bearing the HOUNDSTOOTH MAFIA and Design mark.[31]

Prior to the University's use of the commemorative jerseys in 2006, applicants distributed t-shirts bearing their HOUNDSTOOTH MAFIA and Design mark to friends and other fans tailgating during the University's 2005 football season. Applicants first sold about two dozen t-shirts bearing their trademark in summer 2006, prior to the game against "Ole Miss." Applicants sold some products

---

*http://alabama.teamfanshop.com/Default.aspx?ctl=Products.Browse&categoryID=7a008b7* and is dated 3/24/2009.

[28] Gaston Testimony Dep. p. 23 (Docket # 37); Drucker 5/20/10 Dep. p. 17 (Docket # 41).

[29] Blackburn 3/31/09 Dep. pp. 58-59 (Docket # 29); Drucker 5/20/10 Dep. p. 20 (Docket # 41).

[30] Blackburn 3/31/09 Dep. pp. 16-17, 26 (Docket # 29); Pitts Jr. 3/31/09 Dep. pp. 13-14 (Docket # 29).

[31] Blackburn 3/31/09 Dep. pp. 8-9, 14-15 (Docket # 29); Pitts Jr. 3/31/09 Dep. pp. 7, 11-12 (Docket # 29).

out of applicant Blackburn's custom embroidery shop, and also on eBay, and sold approximately 50 to 100 products with the HOUNDSTOOTH MAFIA and Design trademark out of the back of their vehicle parked in a non-University parking lot before football games.[32] Although applicants' products were offered for sale on both eBay and their website, it was not possible to purchase items from the website.[33] There is no evidence in the record other than applicants' testimony and actual products that supports their sales of products bearing the mark.

According to applicants, the term "Houndstooth Mafia" is a name that refers to a group of guys who "hang out" together, sometimes attending college football games, including Alabama games.[34] The name "Houndstooth Mafia" is a name that could also refer to fans of the University.[35] Applicants have only used their "Houndstooth Mafia and Design" mark on t-shirts and caps, including crimson colored t-shirts and caps.[36] Prior to filing their trademark application, applicants were aware that the University's color scheme is crimson and white.[37] Applicants never tried to obtain a license from the University for their "Houndstooth Mafia and

---

[32] Blackburn 3/31/09 Dep. pp. 44-46, 48-49 (Docket # 29) and Pitts Jr. 3/31/09 Dep. pp. 57-58 (Docket # 29).

[33] Blackburn 3/31/09 Dep. pp. 54, 56, 65, 73-75; Pitts Jr. 3/31/09 Dep. pp. 44, 47-48, 56-58 (Docket # 29).

[34] Blackburn 3/31/09 Dep. pp. 37-38 (Docket # 29).

[35] Blackburn 3/31/09 Dep. p. 39 (Docket # 29).

[36] Blackburn 3/31/09 Dep. pp. 52-53 Exhibits 9-11 OPPS' NOR 148-149, 151, 154, 156-158 (Docket # 29).

[37] Pitts Jr. 3/31/09 Dep. pp. 72-73 (Docket # 29).

Design" mark and are aware that a license is needed in order to put someone else's trademark on a t-shirt. [38]

One of the reasons applicants selected the name "Houndstooth Mafia" is because for the University's fans, the houndstooth pattern is associated with Coach Bryant's houndstooth fedora.[39] Applicants believe fans at University football games wear houndstooth apparel to support the University because Coach Bryant wore a houndstooth fedora.[40] Applicants' products are intended to be worn by fans of the University and anyone else.[41] Applicants selected a houndstooth pattern as the background for their mark to coincide with the words in the mark, i.e., "Houndstooth Mafia" and because houndstooth was a fashion trend.[42]

In their application, applicants admitted in response to an office action that their HOUNDSTOOTH MAFIA and Design mark "makes reference to the houndstooth hat that Coach Bear Bryant wore at Alabama football games."[43] Applicants subsequently confirmed that their mark refers to the houndstooth patterned hat that Coach Bryant wore at many University football games.[44]

Applicants knew that houndstooth patterns were not limited to uses related to the University inasmuch as they had seen houndstooth wingback chairs at

---

[38] Blackburn 3/31/09 Dep. p. 40 (Docket # 29).

[39] Blackburn 3/31/09 Dep. pp. 33-34 (Docket # 29).

[40] Blackburn 3/31/09 Dep. p. 32 (Docket # 29).

[41] Pitts Jr. 3/31/09 Dep. pp. 75-76 (Docket # 29).

[42] Blackburn 3/31/09 Dep. pp. 33-37 (Docket # 29).

[43] Pitts Jr. 3/31/09 Dep., Exhibit 16 OPPs' NOR 0252 (Docket # 29).

[44] Pitts Jr. 3/31/09 Dep. pp. 78-79 (Docket # 29).

furniture stores, dishes with houndstooth pattern around their edges and a Liz Claiborne brand sweater owned by applicant Pitts' wife—none of which were uses of houndstooth patterns in connection with the University.[45]

Applicants received a cease and desist letter dated August 19, 2008, from The Collegiate Licensing Company, the University's licensing agent, requesting that they withdraw their trademark application for the HOUNDSTOOTH MAFIA and Design mark. Applicants did not respond to that letter or withdraw their application. [46]

**D. Standing**

Standing is a threshold issue that must be proved in every *inter partes* case. *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 1028, 213 USPQ 185, 189 (CCPA 1982). In order to meet the standing requirement, a plaintiff need only show that it has a real interest, *i.e.,* a personal stake, in the outcome of the proceeding. *See Ritchie v. Simpson,* 170 F.3d 1092, 1095, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999); *Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.,* 823 F.2d 490, 492-493, 2 USPQ2d 2021, 2023-24 (Fed. Cir. 1987).

The University has used a houndstooth pattern on apparel and athletic uniforms. It also owns the unregistered mark PAUL W. BRYANT MUSEUM and Design as well as three Alabama State trademark registrations for the mark PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS and Design for goods in Classes

---

[45] Blackburn 3/31/09 Dep. pp. 36-37; Pitts Jr. 3/31/09 Dep. p. 82 (Docket # 29).

[46] Drucker 5/20/10 Dep. p. 13, Exhibit 73 OPPS' NORT 1395 (Docket # 41); Pitts 3/31/09 Dep. p. 29, Exhibit 15 OPPS' NORT 0251 (Docket # 29).

16 and 25, and services in Class 41, all of which display an image of Coach Bryant wearing a patterned fedora hat.

The evidence also shows Coach Bryant's association with patterned fedoras, including houndstooth fedoras, and that Bryant Jr. is the son of Coach Bryant. In view of this association, Bryant, Jr.'s familial connection to Coach Bryant and Bryant, Jr.'s arrangement with the University in connection with the use of the Houndstooth Pattern, Bryant, Jr. has standing.[47] *See In re Wielinski*, 49 USPQ2d 1754, 1758 (TTAB 1998) (person's right to the use of a designation which points uniquely to his/her persona may be protected under § 2(a) after death if heirs or other successors entitled to assert that right exist [citations omitted]). The purpose

---

[47] Bryant, Jr., as the son of Coach Bryant, asserts ownership rights to Coach Bryant's name, likeness and image and that he is involved in licensing those rights. Bryant, Jr. also asserts rights in the Houndstooth Pattern in conjunction with the University. (Bryant, Jr. Testimony Dep. pp. 16-18 (Docket # 35). Opposers assert that they use the alleged Houndstooth Pattern mark with permission of "the Bryant Estate" (Opposers' Trial Brief p. 10), however, it is curious that the estate is not a party to this proceeding. Bryant, Jr. testified that he manages Coach Bryant's estate, yet there is no testimony or evidence explaining how Bryant, Jr. inherited or acquired an interest in Coach Bryant's estate or otherwise owns any rights associated with Coach Bryant's name, likeness and image. Bryant Jr. equivocally testified as to his ownership rights (Bryant, Jr. Testimony Dep. pp. 16-17 (Docket # 35)):

> Q. . . . Do you know who retains the rights in Coach Bryant's name, likeness and image since he passed away?
>
> A. . . . . I think I do.
>
> . . . .
>
> Q. . . . And do you know who owns the houndstooth pattern trademark?
>
> A . . . . I think I do in conjunction with the University of Alabama given the –
>
> Q . . . .Do you own that through Coach Bryant's estate?
>
> A. . . . Yes.

The evidence supporting Bryant, Jr.'s participation in this proceeding while the estate of Coach Bryant sits on the sidelines is very thin. However, applicants have not challenged this issue, so we deem opposers' proof of Bryant Jr.'s standing to be sufficient.

of the standing requirement is to prevent mere intermeddlers from initiating proceedings. But the Federal Circuit has enunciated a liberal threshold for determining standing, namely, whether a plaintiff's belief in damage has a reasonable basis in fact and reflects a real interest in the case. *Ritchie*, 50 USPQ2d at 1025-28 and *Jewelers Vigilance Committee*, 2 USPQ2d at 2023.

The foregoing is sufficient to show that opposers have a real commercial interest in this proceeding and, therefore, have standing. *See Cunningham* v. *Laser Golf* Corp., 222 F.3d 943, 945, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

## E. **Likelihood of Confusion**

Section 2(d) of the Lanham Act precludes registration when a mark is likely to cause confusion with a mark or trade name previously used or registered by another. 15 U.S.C. §1052(d). Hence, in order to prevail on their § 2(d) claim, opposers must establish they have priority in a proprietary term and that registration of applicants' mark will create a likelihood of confusion. *Herbko International Inc.* v. *Kappa Books, Inc.*, 308 F.3d 1156, 1162, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002); *King Candy Co.* v. *Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1402, 182 USPQ 108, 110 (CCPA 1974).

### 1. **Opposers' Alleged Marks**

Opposers' opposition is predicated on three alleged marks they characterize as follows:

(1) a Houndstooth Pattern used in connection with the University's licensed apparel and as an alleged source indicator for Coach Bryant, and the University's educational and athletic services;

20

(2) the University's Crimson and White color scheme as used in connection with the University's goods and services; and

(3) the University's common law rights in the PAUL W. BRYANT MUSEUM and Design logo and Alabama state trademark registrations for the mark the PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS and Design.

## 2. Priority

Opposers must prove they used their alleged marks as a trademark or service mark, or in a manner analogous to a mark (i.e., that they have proprietary rights in the alleged marks), before either the actual or constructive first use date by applicants (whichever is earlier).[48] *Automedx Inc.* v. *Artivent Corp.*, 95 USPQ2d 1976, 1978 (TTAB 2010) citing *Herbko*, 308 F.3d at 1162, 64 USPQ2d at 1378; *Otto Roth*, 640 F.2d at 1320, 209 USPQ at 43; *Miller Brewing Co.* v. *Anheuser-Busch Inc.*, 27 USPQ2d 1711, 1714 (TTAB 1993).

Before determining whether opposers have established priority, we must first tackle the issue whether opposers own any proprietary rights. If opposers have not established proprietary rights in their alleged marks, then the issues of priority and likelihood of confusion are moot and need not be considered.

---

[48] Although opposers did not specifically plead priority, the issue was tried by implied consent as both parties addressed this issue in their trial briefs.

21

### 3. Opposers' Use of Alleged Marks

#### (a) Houndstooth Pattern

Houndstooth, as shown in the image below, is defined as "a pattern of broken or jagged checks, used on a variety of fabrics:"[49]



Because houndstooth is a known textile pattern, the crucial question is whether there is a point at which the houndstooth pattern transitions from being an ornamental fabric design to a proprietary design that identifies and distinguishes opposers' products and services. Opposers' answer to this question is to limit their asserted rights in the alleged Houndstooth Pattern mark to circumstances when: (1) the Houndstooth Pattern is used on products sold in the state of Alabama or (2) houndstooth is used in connection with other trademarks or indicia of opposers.[50]

Opposers contend the University has been using the Houndstooth Pattern as a trademark with permission from Bryant, Jr. in connection with "educational and athletic services" for about half a century,[51] and that the Houndstooth Pattern has

---

[49] *The Random House Dictionary of the English Language*, Second Edition. Unabridged. 1987.

[50] Opposers' Trial Brief p. 9, n. 3.

[51] Inasmuch as Coach Bryant's death occurred thirty years ago in January, 1983, the University's contentions that it has used the alleged Houndstooth Pattern mark with the permission of Bryant's estate for "more than fifty years" and "almost half a century" are not accurate. We assume that the University's position is that it has used the alleged Houndstooth Pattern mark with the permission of both Coach Bryant and his estate for about the past fifty years but there is no evidence that supports this position.

been used on a variety of goods.[52] For opposers to prevail on their section 2(d) claim, we must find that during his life, Coach Bryant owned protectable common law trademark rights in the Houndstooth Pattern, that these rights were acquired by his estate, and that Coach Bryant, during his lifetime, or later Bryant's estate, licensed their trademark rights in the Houndstooth Pattern to the University. When reviewing these requirements in connection with the evidence, it is clear opposers have fumbled.

Opposers provided extensive evidence that Coach Bryant wore a patterned fedora, often featuring a houndstooth pattern, since as early as 1965. There is no evidence that the hats worn by Coach Bryant were one-of-a-kind, custom-designed, or anything other than commercially-available men's fedora hats. The mere fact that Coach Bryant was recognized for wearing patterned fedoras at the University's football games does not endow either Coach Bryant (including his estate) or the University with trademark rights in the Houndstooth Pattern. There is no evidence that Coach Bryant ever used the Houndstooth Pattern as a trademark in connection with products or services. Despite Bryant, Jr.'s vague testimony that he has "allowed" the University to use the Houndstooth Pattern, opposers have not shown that Bryant's estate owned any trademark rights in the Houndstooth Pattern that the University could have been "allowed" to use. To the contrary, the evidence shows that any commercial uses of the asserted Houndstooth Pattern arose well after Coach Bryant's death in January 1983.

---

[52] Opposers' Trial Brief pp. 10-11; Gaston Testimony Dep. pp. 19-20 (Docket # 37); Bryant, Jr. Testimony Dep. pp. 17-18 (Docket # 37).

In view of the foregoing, the University did not acquire trademark rights in the Houndstooth Pattern from Coach Bryant or his estate, so we look downfield to consider whether the University itself has established common law trademark or service mark rights in the Houndstooth Pattern.

Despite the wide array of evidence showing its use of a Houndstooth Pattern, the University failed to define or describe the manner in which the Houndstooth Pattern is being used as a trademark to identify its goods and services. For example, to support its service mark use of the Houndstooth Pattern, the University points to various promotional publications, including yearbooks, sports programs and brochures, featuring photos of Coach Bryant wearing a houndstooth-patterned fedora, and more recent photos of tennis team members wearing baseball caps made of houndstooth fabric.[53] All of the images merely show nominal ornamental use of a houndstooth fabric pattern on hats worn by persons affiliated with opposers; they do not show use of the Houndstooth Pattern in a distinctive manner that creates an association of the pattern with the services provided by the University.

Over the past thirty years, the University sporadically used the Houndstooth Pattern as a decorative feature on products. As previously noted, it first displayed the Houndstooth Pattern during the football season following Coach Bryant's death in January 1983, on stickers applied to football players' helmets. Twenty-three years later in 2006, the University's football players wore commemorative jerseys

---

[53] Opposers' Trial Brief p. 11; Gaston Testimony Dep. p. 20, Exhibits 15 (OPP NORT 485-486), 18-20 (OPP NORT 492-495) (Docket # 37), and 22-23 (OPP NORT 854-861) (Docket # 38).

where the Houndstooth Pattern trimmed the neck opening of the jersey, and an unidentified number of similar jerseys were subsequently sold to the public.[54] Some members of its football team wore gloves made of a Houndstooth Pattern fabric and a bearing a large crimson "Stylized A" during the 2009 Sugar Bowl football game.[55] By the University's own admission, its uses of the Houndstooth Pattern were to commemorate Coach Bryant.[56] The University has not shown how such *commemorative* uses serve as sponsorship or source identifiers for the University. At some point in time, female members of the University's tennis team wore caps bearing the Houndstooth Pattern with the University's "Stylized A" trademark on the front of the cap.[57] Sometime in 2006 or later, the University began selling apparel that incorporated a houndstooth design.[58] This apparel also bears identifying indicia of the University such as its "Stylized A" logo on the front of the apparel.[59]

Because the University does not own any federal trademark registrations for the Houndstooth Pattern, it must prove that the pattern is inherently distinctive, or

[54] Blackburn 3/31/09 Dep. p. 43 (Docket #29); Gaston Testimony Dep. p. 20, Exhibit 16 NORT 487-489 (Docket # 37); Pitts Jr. 3/31/09 Dep. p. 80 (Docket #29).

[55] Gaston Testimony Dep. p. 20 (Docket # 37). Although not in evidence and without objection by applicants, the image of the gloves shown in Opposers' Trial Brief at p. 11, clearly shows the University's "Stylized A" trademark on the gloves.

[56] Gaston Testimony Dep. p. 20, Exhibit 17 OPP NORT 490-491 (Docket # 37); Opposers' Trial Brief pp. 10-11.

[57] Opposers' Trial Brief p. 11; Gaston Testimony Dep. p. 23 (Docket # 37), Exhibit 23 OPP NORT 856-861 (Docket # 38).

[58] There is scant testimony as to when the University began selling such products and corroborative evidence such as sales figures for these products is lacking.

[59] Drucker 3/28/11 Dep. pp. 9-56, Exhibits 81-140 OPPS' NORT 1873-2051 (Docket # 60).

has acquired distinctiveness. *Hoover Co.* v. *Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1359, 57 USPQ2d 1720, 1721 (Fed. Cir. 2001); *Towers* v. *Advent Software, Inc.*, 913 F.2d 942, 16 USPQ2d 1039, 1041 (Fed. Cir. 1990) citing *Otto Roth*, 640 F. 2d at 1320, 209 USPQ at 43; *Threshold.TV, Inc.* v. *Metronome Enterprises Inc.*, 96 USPQ2d 1031, 1036-37 (TTAB 2010).

All of the examples of asserted trademark use of the Houndstooth Pattern, except for the commemorative stickers, show it as a background on which one or more of the University's other trademarks is displayed. Where the background display of a mark is sought to be registered, such design may be registered without any showing of acquired distinctiveness only if it is by its very nature distinctive or unique enough to create a commercial impression as an indication of origin separate and apart from the remainder of the mark; conversely, if the design is not inherently distinctive, that is, if it is mere background material which does not inherently create a separate commercial impression as a trademark, it may be registered only upon proof of acquired distinctiveness. *See In re Esso Standard Oil Co.*, 305 F.2d 495, 134 USPQ 402 404-05 (CCPA, 1962); *In re E. J. Brach & Sons*, 256 F.2d 325, 327, 118 USPQ 308, 309-10 (CCPA, 1958); *In re Swift & Co.*, 223 F.2d 950, 953-54, 106 USPQ 286, 288 (CCPA 1955); *In re Raytheon Co.*, 202 USPQ 317, 318 (TTAB 1979). As explained in *Permatex Co., Inc.* v. *California Tube Products, Inc.*, 175 USPQ 764, 766 (TTAB 1972):

> "It is settled that common basic shapes such as circles, ovals, triangles, diamonds, stars, and other geometric designs, when used as vehicles for the display of word or letter marks, are not regarded as indicia of origin for the

goods to which they are applied in the absence of a showing of secondary meaning in the design alone [citations omitted]. *The rationale behind these cases is that designs of this character have been so commonly employed as background devices for word marks that composite marks of this type create but a single commercial impression with the result that purchasers would normally utilize the word portions of the marks to identify and distinguish the goods sold thereunder*; and that differences between word portions of different marks utilizing the same common background design would generally be sufficient to avoid trade confusion.

There are [sic], however, *a line of cases that hold for the proposition that where the background design of a composite mark is not commonplace, but is unique or unusual in a particular field of endeavor, said design can be considered to be 'inherently distinctive' and no proof of secondary meaning need be introduced to show that it functions as a trademark*, separate and apart from the word feature, to identify a party's goods in commerce. [citations omitted] In other words, where the background design of a unitary mark is 'inherently distinctive,' the mark is deemed to consist of two separate features, either one of which can serve to identify the goods of the owner of the mark." (emphasis added).

While we do not rule out the possibility that a houndstooth pattern can constitute an inherently distinctive trademark based on the manner in which it is used, the evidence shows the alleged Houndstooth Pattern mark is used in an ornamental fashion and would be perceived as a non-distinctive background design, rather than as an indicator of source or sponsorship. Generally, where the design sought to be protected is common or ornamental, the party alleging trademark rights in the design has an "unusually heavy burden" to show acquired distinctiveness, i.e., to show that in fact the purchasing public recognizes the design as a trademark which identifies the source of the goods. *See, e.g., Yamaha Int'l*

*Corp.* v. *Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988) (citing with approval the Board's observation that a party seeking to establish that a common ornamental design has acquired distinctiveness bears "an unusually heavy burden"); *In re Chevron Intellectual Property Group LLC*, 96 USPQ2d 2026, 2030 (TTAB 2010). While ornamentation is not incompatible with trademark function, "unless the design is of such nature that its distinctiveness is obvious, convincing evidence must be forthcoming to prove that in fact the purchasing public does recognize the design as a trademark which identifies the source of the goods." *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116, 1124, 227 USPQ 417, 422 (Fed. Cir. 1985).

Our primary reviewing court and the Board look to *Seabrook Foods, Inc.* v. *Bar-Well Foods Ltd.,* 568 F.2d 1342, 196 USPQ 289 (CCPA 1977), to determine whether a design (exclusive of product design, which can never be inherently distinctive) used in connection with goods or services, is inherently distinctive.[60] *See In re Chippendales USA Inc.*, 622 F.3d 1346, 1357-58, 96 USPQ2d 1681, 1689 (Fed. Cir. 2010); *In re Procter & Gamble Co.*, 105 USPQ2d 1119, 1122 (TTAB 2012); *In re Right-On Co. Ltd.*, 87 USPQ2d 1152, 1155 (TTAB 2008).

*Seabrook* articulates the following factors for determining whether a design is inherently distinctive: (1) whether the design is a common basic shape or design; (2) whether the design is unique or unusual in the field in which it is used; (3) whether the design is a mere refinement of a commonly-adopted and well-known

---

[60] Product design can never be inherently distinctive. *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U.S. 205, 54 USPQ2d 1065 (2000).

form of ornamentation for the particular class of goods or services viewed by the public as a dress or ornamentation for the goods and services; or (4) whether the design is capable of creating a commercial impression distinct from any accompanying matter, if presented together with text or other matter. *Id*.

Looking to the first three factors, the University uses the traditional houndstooth pattern, a known fabric pattern design, as a background fabric for its apparel together with University trademarks which are displayed on the background, and nominally utilizes the pattern in promotional materials that feature images of Coach Bryant wearing houndstooth fedoras. Opposers' use of the alleged Houndstooth Pattern mark on the surface of apparel products is not "unique or unusual." To the contrary, houndstooth is "a pattern of broken or jagged checks, often used on fabrics," and opposers' use of the Houndstooth Pattern for apparel is quite the "usual" application. With respect to the fourth factor, it is conceivable that a houndstooth pattern could create a commercial impression separate and distinct from any accompanying matter. In the context of opposers' ordinary use of the Houndstooth Pattern however, the pattern is highly unlikely to have created a distinct commercial impression. *See Right-On*, 87 USPQ2d at 1155 (pocket-stitching design is commonly adopted form of ornamentation and not inherently distinctive); *In re Lululemon Athletica Canada Inc.*, 105 USPQ2d 1684 (TTAB 2013) (simple wave design appearing as piping on apparel likely to be perceived as mere ornamentation). Because the *Seabrook* factors demonstrate opposers' use of the Houndstooth Pattern is not inherently distinctive, it can only be recognized as a

trademark upon proof of acquired distinctiveness. *Cf. Standard Terry Mills, Inc.* v. *Shen Mfg. Co.*, 803 F.2d 778, 781, 231 USPQ 555, 558 (3d Cir. 1986) ("windowpane check" pattern on a kitchen towel is not a protectable trade dress because it is "functional" as being a "favorite pattern for kitchen textiles" and "compatible with contemporary kitchen decor."); *In re David Crystal, Inc.*, 296 F.2d 771, 132 USPQ 1 (CCPA 1961) (colored bands around top of men's socks held nondistinctive and proof of secondary meaning insufficient); *In re Hehr Mfg. Co.*, 279 F.2d 526, 126 USPQ 381 (CCPA 1960) (nondistinctive square red label registered upon proof of acquired distinctiveness); *In re Schenectady Varnish Co.*, 280 F.2d 169, 126 USPQ 395 (CCPA 1960) (design consisting of cloud and lightning flash registrable on showing of secondary meaning).

(1)  Has the University Acquired Distinctiveness in the Houndstooth Pattern?

Whether the Houndstooth Pattern is viewed as an ornamental or a non-distinctive design, the University bears the burden of proving acquired distinctiveness, i.e., "secondary meaning," by a preponderance of the evidence. *Tone Brothers Inc.* v. *Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1327 (Fed. Cir. 1994) citing *Yamaha Int'l Corp.*, 840 F.2d 1572, 6 USPQ2d at 1006, and must establish acquired distinctiveness in the Houndstooth Pattern before the date on which applicants can establish their rights. *Threshold.TV*, 96 USPQ2d at 1036 and *Herbko*, 308 F.3d 1162, 64 USPQ2d at 1378.

Acquired distinctiveness can be shown by direct evidence such as actual testimony, declarations or surveys of consumers as to their state of mind; and/or

circumstantial evidence from which consumer association might be inferred, such as length and exclusivity of use, extensive sales and advertising expenditures, unsolicited media coverage, consumer studies and any similar evidence showing wide exposure of the mark to consumers. There is no fixed rule for the amount of proof necessary to demonstrate acquired distinctiveness. *In re Steelbuilding.com*, 415 F.3d 1293, 1300, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005); *Threshold.TV*, 96 USPQ2d at 1038; *In re Brouwerij Bosteels*, 96 USPQ2d 1414, 1424 (TTAB 2010). The amount and character of evidence required to establish acquired distinctiveness depends on the facts of the case and particularly on the nature of the mark sought to be registered or protected. *See Roux Laboratories, Inc.* v. *Clairol Inc.*, 427 F.2d 823, 829, 166 USPQ 34, 39 (CCPA 1970).

Because the University's merchandise utilizes the Houndstooth Pattern in an ornamental and non-distinctive fashion together with other trademarks and identifying indicia of the University, opposers must show that the alleged Houndstooth Pattern mark has acquired distinctiveness independent and separate from any other indicia on the products. There is no evidence showing that the Houndstooth Pattern creates a commercial impression distinct from any accompanying indicia of the University or that the University has promoted it as such. Opposers have punted away their claim of broad rights in any use of a houndstooth pattern by conceding that they only claim rights in the Houndstooth

31

Pattern "when the houndstooth pattern is used on products sold in Alabama or used in connection with trademarks or other indicia of the University or Coach Bryant."[61]

In view of the lack of evidence and opposers' own recognition of the significant role of its identifying indicia, we conclude that any association of the Houndstooth Pattern background design with the University is predicated upon the impression conveyed by the University's indicia appearing thereon rather than by any distinctive characteristic or use of the Houndstooth Pattern *per se*.   *See Seabrook*, 568 F.2d at 1345, 196 USPQ at 292; (design is never displayed apart from the word mark); *In re Benetton Group S.p.A.,* 48 USPQ2d 1214, 1217 (TTAB 1998) (no secondary meaning where green rectangle used as background design for word mark); *In re Mogen David Wine Corp.*, 372 F.2d 539, 542, 152 USPQ 593, 595 (CCPA 1967) (where advertising depicting the bottle design sought to be registered always featured the word mark, such evidence failed to prove secondary meaning in the design itself); *In re McIlhenny Co.*, 278 F.2d 953, 956-57, 126 USPQ 138, 140-41 (CCPA 1960) (bottle design has not acquired distinctiveness where evidence showed prominent labeling with applicant's registered mark and trade name).

There is no evidence the University promoted or treated the Houndstooth Pattern as a trademark.  Its early uses of the Houndstooth Pattern on helmet stickers and football jerseys were commemorative one-time uses.  The University has never identified the Houndstooth Pattern as a trademark on product labeling or

---

[61] Opposers' Trial Brief p. 9, n. 3.

promoted it in advertising as such.[62]   Notably, neither the University's Graphic Standards 2010-2012 manual which sets forth guidelines for "reproducing the marks of the University," nor its "Indicia Artwork" guide identify the alleged Houndstooth Pattern mark as a trademark or other identifier of the University.[63]

Opposers submitted a substantial amount of evidence of media coverage commenting on Coach Bryant's houndstooth fedora, (which was sometimes referred to as a "checked" or "patterned" fedora).   Although such evidence supports the association of a houndstooth fedora with the Coach, it does not prove any trademark association of the Houndstooth Pattern with the University.   For example, if the Coach left the employ of the University, it is clear that the association with a houndstooth fedora would follow the Coach as the person who wore the hat.   *See Herman Miller Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 315, 60 USPQ2d 1633, 1646 n.7 (6th Cir. 2001) (in proving acquired distinctiveness, "Herman Miller must demonstrate that when the buying public recognizes the lounge chair and ottoman as 'an Eames,' it recognizes that 'an Eames,' comes from

---

[62] To show that the alleged Houndstooth Pattern mark has been used in advertising, opposers point to billboards bearing the Paul W. Bryant Museum and Design mark. Opposers' Trial Brief p. 14.  Use of the Paul W. Bryant Museum and Design mark, where the mark contains the words "Paul W. Bryant Museum" together with an image of Coach Bryant wearing a patterned fedora, does not promote the trademark significance of the Houndstooth Pattern.  Billboards advertising the Bryant Museum incorporating an image of Coach Bryant wearing a patterned hat or promotional materials featuring Coach Bryant and later, members of the University's tennis team in houndstooth caps, is hardly the type of advertising that would cause consumers to make a sponsorship or source-identifying association between the Houndstooth Pattern and the University's goods and services.

[63] See Gaston Testimony Dep. pp. 25-26, Exhibits 27 (OPPS' NORT 868-911) and 28 (OPPS' NORT 912-914) (Docket # 38) ("The University of Alabama is the owner of all rights, title and interest in and to the following Indicia, which includes trademarks, service marks, trade names, designs, logos, seals and symbols.").

one source – one anonymous manufacturer. The evidence that Herman Miller presents simply associating the lounge chair and ottoman with the Eameses, and not Herman Miller, fails to indicate that in the mind of the consuming public the furniture is connected with a single, although anonymous, source that manufactures it.").

By not providing evidence of "look for" advertising or other promotional efforts to create consumer association between the Houndstooth Pattern and the University as the source or sponsor of its goods or services, the University loses ground. The Board and other courts have long noted the importance of such advertising in establishing the existence of acquired distinctiveness. *See Mag Instrument Inc.* v. *Brinkmann Corp.*, 96 USPQ2d 1701, 1723-24 (TTAB 2010) (perhaps most damaging to showing of acquired distinctiveness is lack of any "look for" advertising), *aff'd mem.*, 2011 WL 5400095 (Fed. Cir. Nov. 9, 2011); *Seabrook*, 568 F.2d at 1345, 196 USPQ at 291 (advertising emphasizing design portion of the mark to potential customers is persuasive evidence of acquired distinctiveness); *Duraco Prods. Inc.* v. *Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1452, 32 USPQ2d 1724, 1741 (3d Cir. 1994) (advertising expenditures "measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature" of the product configuration); *see also, Thomas & Betts Corp.* v. *Panduit Corp.*, 65 F.3d 654, 662, 36 USPQ2d 1065, 1071-72 (7th Cir. 1995) ("look for" advertising encourages consumers to connect the claimed trade dress with the particular producer); *First Brands Corp.* v. *Fred Meyer Inc.*, 809 F.2d 1378, 1383, 1

USPQ2d 1779, 1782 (9th Cir. 1987) ("[A]dvertising campaign has not stressed the color and shape of the antifreeze jug so as to support an inference of secondary meaning."). The University did not produce evidence of any advertising, much less "look for" advertising that highlights the Houndstooth Pattern.

The University submitted evidence of $330 million of sales of licensed University-related apparel over a five year period from 2004 to 2009, some of which incorporates the Houndstooth Pattern. However, the University's sales figures do not break down the actual dollar amount of sales for merchandise bearing the Houndstooth Pattern, nor does the University provide a date on which the sale of such merchandise bearing the Houndstooth Pattern began.[64] In view of the lack of specificity in the University's sales figures, this evidence is not probative of acquired distinctiveness.

Even if such itemized sales information were provided, it would have limited value due to the fact that the houndstooth apparel prominently features the University's trademarks, including, but not limited to its "Alabama," "Crimson Tide," and "Stylized A" trademarks. Additionally, substantial sales may simply indicate the popularity of the products attributable to some other factors such as the fashionable nature of houndstooth, or the popularity of the University's trademarks on the products, rather than to an association between the Houndstooth Pattern itself and the University and/or its goods. *See In re Soccer Sport Supply Co.*, 507 F.2d 1400, 184 USPQ 345, 348 (CCPA 1975) (where proffered evidence of

---

[64] Drucker 5/20/10 Dep. p. 16 (Docket # 41), Confidential Exhibit 75 (Docket # 40).

acquired distinctiveness consists of simultaneous use of marks other than alleged mark at issue, it may fail to show the alleged mark, rather than the other marks present, has acquired distinctiveness); *In re Bongrain Int'l (American) Corp.*, 894 F.2d 1316, 1318, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may indicate the popularity of the product, rather than trademark significance, or it may indicate acceptance of applicant's other mark on the package); *In re Semel*, 189 USPQ 285, 287 (TTAB 1975) (in evaluating advertising figures, it is necessary to also consider not only the extent of advertising but also whether the advertising has been effective in creating an association between the mark sought to be registered and the goods and/or services).

Opposers submit only the conclusory testimony of the University's Senior Associate Athletic Director and Chief Financial Officer of Athletic Department, and the University's licensing agent, as evidence that the University licenses the Houndstooth Pattern.[65]   Oddly, opposers did not provide copies of any license agreements reflecting the licensing terms. In the absence of evidence establishing that the Houndstooth Pattern itself is the subject matter of the licenses, *i.e.*, is treated as a trademark in the licenses, the mere existence of license agreements for

---

[65] Mr. Gaston merely confirmed that the University sells licensed apparel items bearing the houndstooth pattern.  Gaston Testimony Dep. p. 23 (Docket # 37).  Opposers' licensing agent, Michael Drucker, testified that in April 2006, the University licensed Nike to produce and sell apparel bearing the alleged Houndstooth Pattern mark.  Drucker 5/20/10 Dep. pp. 17-18, Exhibits 76-77, OPPS' NOR 1405-1424 (Docket # 41).  However, the testimony did not shed any light on critical information—whether the license recognized the Houndstooth Pattern as a proprietary trademark.  The Exhibits identified by the witness to support the existence of a license were entitled "Artwork Approval Form" and do not contain any licensing terms.  Because no copy of the license agreement was submitted to the Board, there is no evidence that the license designated the Houndstooth Pattern as a trademark rather than just the type of fabric to be used on the products.

products bearing a Houndstooth Pattern that is used with other indicia of the University are not probative of acquired distinctiveness.

Although the University has "licensed products displaying the Houndstooth Pattern since at least as early as 2006," according to its licensing agent, there is scant evidence as to when such items were first sold, and no evidence of the amount of their sales. During the testimony deposition of Michael Drucker, Vice President and Associate General Counsel for Collegiate Licensing Company, the University's licensing agent, Mr. Drucker testified that the University licenses a variety of apparel items displaying the Houndstooth Pattern including, hats, t-shirts and sweatshirts.[66] Yet, of the more than 1600 University-licensed items shown in the exhibits to Mr. Drucker's May 20, 2010 deposition which was well after applicants' filing date, including apparel items and various collateral products, only four items, consisting of women's t-shirts and a baseball cap, bear the Houndstooth Pattern.[67] By the time of Mr. Drucker's rebuttal testimony on March 28, 2011, 60 items bearing the Houndstooth Pattern were being offered for sale. *See Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 45 (CCPA 1981) (opposer resting on common law rights in descriptive mark must show secondary meaning prior to application). Notably, all of the items with the Houndstooth Pattern bear trademarks or other indicia of the University. Without information regarding the extent of sales and manner of promotion of such products, their mere availability for

---

[66] Drucker 5/20/10 Dep. p. 16-17 (Docket # 41).

[67] See Exhibits 78-80 to Drucker 5/20/10 Dep. (OPPS' NORT 1425-1568) (Docket # 41); pages OPPS' NORT 1425, 1427-1428 and 1483 display t-shirts and a baseball cap with the houndstooth pattern.

purchase does not provide probative evidence of the acquired distinctiveness of the Houndstooth Pattern. *See In re Soccer Sport Supply*, 507 F.2d 1400, 184 USPQ at 348.

Nor have opposers introduced any survey evidence of acquired distinctiveness. While survey evidence is not required, considering the ornamental nature of the Houndstooth Pattern, the lack of a survey in the absence of other probative evidence of acquired distinctiveness leaves little basis for us to recognize opposers' alleged ownership of trademark rights in the Houndstooth Pattern.[68]

In some cases, such as those involving highly descriptive marks, the nature of the term being asserted as a trademark requires an enhanced evidentiary showing to prove acquired distinctiveness. *See, e.g., Yamaha Int'l Corp.*, 840 F.2d 1572, 6 USPQ2d at 1006; *Chevron Intellectual Property Group*, 96 USPQ2d at 2030; *Target Brands Inc.* v. *Hughes*, 85 USPQ2d 1676, 1681-82 (TTAB 2007). Given the similar non-distinctive nature of the Houndstooth Pattern, because houndstooth is a common pattern when used on apparel items, additional evidence, especially in the form of direct consumer evidence, would have been helpful to show that the Houndstooth Pattern has become distinctive and that consumers view the Houndstooth Pattern as a distinctive source or sponsorship indicator for opposers' goods and services.

The testimony submitted by the parties is in agreement to the extent the parties agree that the public associates houndstooth with Coach Bryant's hat and

---

[68] *Yamaha*, 840 F.2d at 1583, 6 USPQ2d at 1010 (Fed. Cir. 1988) (the "absence of a survey need not preclude a finding of acquired distinctiveness").

fans wear houndstooth apparel to the University's football games to show support for the University because they know that is "what Coach Bryant wore."[69] Regardless of their reasons for wearing houndstooth apparel however, there is no evidence the houndstooth of the fans' apparel functions as a source or sponsorship indicator for the University's goods and services, or that it was authorized by the University. The University's non-exclusive use of the Houndstooth Pattern is apparent from the availability and suitability of houndstooth fabric patterns for consumer apparel that is not sponsored by the University. Therefore, in the absence of a showing that the Houndstooth Pattern is distinctive of the University even in the state of Alabama, the fact that fans wear houndstooth apparel of unknown origin cuts against the University's exclusive use of the alleged Houndstooth Pattern mark. Thus, the record does not persuade us that the public recognizes the alleged Houndstooth Pattern mark as a trademark identifying goods and services emanating from opposers.

Further, the evidence does not show that opposers have enjoyed substantially exclusive use of the Houndstooth Pattern either in the state of Alabama, or in connection with indicia of the University. Houndstooth is a known fabric pattern available to the general public and as shown by applicants' evidence, has been used by third-parties for items marketed to the University's fans. The website *ehoundstooth.com* contains images of products covered with houndstooth patterns offered for sale on the same page as products bearing the University's "Stylized A"

---

[69] Bryant, Jr. Testimony Dep. p. 17 (Docket # 35); Gaston Testimony Dep. pp. 24-25 (Docket # 37); Blackburn 3/31/09 Dep. p. 27 (Docket # 29).

logo and the word "Champions"[70]; *houndstoothhut.com* offers houndstooth products as well as items targeted to Alabama fans including books about Bear Bryant and Alabama SEC Champion t-shirts[71]; the *crimsonhoundstooth.com* site offers Alabama t-shirts, and t-shirts bearing an image of a patterned fedora, and identifies its physical address at Crimson Houndstooth, in Anniston, Alabama.[72]  Not only does this Internet evidence show that products bearing a houndstooth pattern together with indicia of the University are offered for sale and marketed by third parties in the same channels of trade, i.e., the Internet, to the same types of customers, i.e., fans of the University, it shows that these products are being marketed in connection with domain names containing the word "houndstooth." Additionally, The Houndstooth Sports Bar, located in the University's hometown of Tuscaloosa, uses a cartoon-like logo of a dog sitting in a dog house wearing a houndstooth patterned fedora, and sells t-shirts bearing the logo to Alabama fans. Its *houndstoothsportsbar.com* website also features the houndstooth fedora-wearing dog logo and offers apparel items bearing the logo for sale.[73]

Collectively, these third-party uses of the houndstooth pattern and domain names show the University's use of a Houndstooth Pattern for such products has not been exclusive in the state of Alabama, in Tuscaloosa, or in connection with

---

[70] See APP NOR-003 (Docket # 34).

[71] See APP NOR 005-012 (Docket # 34).

[72] See APP NOR 013-014 (Docket # 34).

[73] See APP NOR 021-025 (Docket # 34).

indicia of the University, and undermine a claim of acquired distinctiveness.[74] *In re Owens-Corning*, 227 USPQ at 424 n. 11, citing *Levi Strauss & Co.* v. *Genesco, Inc.*, 742 F.2d 1401, 1404-05, 222 USPQ 939, 942 (Fed. Cir. 1984) (distinctiveness is acquired by "substantially exclusive and continuous use" of the mark in commerce); *Target Brands*, 85 USPQ2d at 1682-83. We acknowledge that acquired distinctiveness tolerates a certain level of use by others, but such use is permitted only so long as it does not rise to a level that invalidates the party's claim of "substantially exclusive and continuous" use. The third-party contemporaneous use of a houndstooth pattern for apparel and other items closely related to the University's apparel and collateral items calls opposers' substantially exclusive use into question, and along with the other deficiencies noted above, defeats any claim of acquired distinctiveness.[75] *See, e.g.*, *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 222 USPQ 939 (Fed. Cir. 1984) ("When the record shows that purchasers are confronted with more than one (let alone numerous) independent users of a term or device, . . . distinctiveness on which purchasers may rely is lacking under such circumstances.").

In conclusion, opposers' evidence does not get it into the end zone by proving it has trademark rights in the alleged Houndstooth Pattern mark. The evidence

---

[74] Despite any limitations in the probative value of the third-party uses due to the absence of evidence regarding the extent of exposure, distribution or sales, this evidence has not been rebutted and thus, the excerpts provide some evidence of the lack of distinctiveness of opposers' alleged Houndstooth Pattern mark.

[75] Pursuant to the *Otto Roth* rule, the University cannot prevail on its likelihood of confusion claim unless it shows that the unregistered Houndstooth Pattern is either inherently distinctive or acquired distinctiveness before applicants' priority date. *Otto Roth*, 640 F.2d at 1320, 209 USPQ at 44-45.

simply does not prove that either Bryant, Jr. or the University established proprietary trademark rights in the Houndstooth Pattern or that the Houndstooth Pattern has been treated as a trademark in license agreements, product labeling, graphic standards and artwork manuals, advertising or otherwise. The absence of evidence concerning the volume of sales or advertising for product promotion or packaging featuring the alleged Houndstooth Pattern mark, or any other evidence from which consumer association might be inferred, compels the finding that the University has not met its burden of proving acquired distinctiveness in the Houndstooth Pattern. The University's reliance on its other trademarks and indicia as a predicate for its rights in the Houndstooth Pattern is a recognition that the Houndstooth Pattern has not acquired distinctiveness as a source or sponsorship identifier of the University's goods and services. Given the third-party uses of a houndstooth pattern and the lack of probative evidence to support consumers' association of products bearing a Houndstooth Pattern with opposers, opposers have no proprietary trademark rights in the Houndstooth Pattern, even if we accept their restriction that it would be recognized as its trademark only in the state of Alabama.

Opposers also assert proprietary rights in the Houndstooth Pattern when it is used in connection with other trademarks or indicia of opposers. Other than a houndstooth pattern, applicants' mark does not contain any alleged trademarks or other indicia owned by opposers. To the extent that opposers look to applicants' use of a red and white color scheme or other indicia used in combination with

42

applicants' HOUNDSTOOTH MAFIA and Design mark to charge applicants with "infringing" their rights, such disputes are not the proper subject for an opposition proceeding.[76]

The Trademark Act provides several causes of action which the Board cannot entertain in adversary proceedings. These include, *inter alia*, questions of infringement and unfair competition. See *Andersen Corp.* v. *Therm-O-Shield Int'l, Inc.*, 226 USPQ 431, 432 n.5 (TTAB 1985) (Board may not entertain any claim based on § 43(a) of the Trademark Act); *Electronic Water Conditioners, Inc.* v. *Turbomag Corp.*, 221 USPQ 162, 163 (TTAB 1984) (unfair competition and § 43(a) claims are outside the jurisdiction of the Board). The function of the Board is to determine whether there is a right to secure or maintain a registration; the Board can do nothing to prevent parties from using a mark in a certain manner. *Person's Co.* v. *Christman*, 900 F.2d 1565, 1570-71, 14 USPQ2d 1477, 1481 (Fed. Cir. 1990)*; The Wallpaper Manufacturers, Ltd.* v. *Crown Wallcovering Corp.*, 680 F.2d 755, 766-67, 214 USPQ 327, 336 (CCPA 1982).

The University has more recently used a Houndstooth Pattern in connection with its licensed apparel and other University goods and services. The evidence as a whole however is insufficient to show that the pertinent consumers recognize and associate the Houndstooth Pattern as a *source* or *sponsorship* indicator of opposers

---

[76] See footnote 3 on p. 9 of Opposers' Trial Brief, ". . . Opposers have never claimed that every instance in which the Houndstooth Pattern appears violates their rights. Instead, only when the Houndstooth Pattern is used on products sold in Alabama or used in connection with other trademarks or indicia of the University or Coach Bryant does such an unauthorized use of the Houndstooth Pattern create consumer confusion and thus *infringe* on Opposers' rights in the Houndstooth Pattern." (emphasis added).

or that any such association was created prior to the December 3, 2007, filing date of applicants' application. *Otto Roth*, 640 F.2d at 1320, 209 USPQ at 44-45. For the reasons set forth above, opposers have not established that their use of a Houndstooth Pattern results in the pattern itself being perceived as a distinctive mark and, therefore, cannot serve as a basis to deny registration of applicants' mark on likelihood of confusion grounds.

### (b) Crimson and White Color Scheme

For more than one hundred years, the University has used a Crimson and White color scheme in connection with its university-related goods and services.[77] Through the testimony of two witnesses, the University presented evidence that, as early as 1984, the University has licensed its Crimson and White color scheme as a trademark in connection with apparel, prints, posters, cups, mugs, calendars, books, and other products.[78]

The University contends that only when the Crimson and White color scheme is either (1) used on products sold in Alabama or (2) used in connection with other trademarks or indicia of the University, does applicants' unauthorized use of their mark create confusion and "thus infringe on Opposers' rights" in the color scheme.[79] Because applicants' HOUNDSTOOTH MAFIA and Design application makes no

---

[77] Gaston Testimony Dep. pp. 25-27 (Docket # 37).

[78] Gaston Testimony Dep. p. 31, Ex. 42 OPP NORT 1137-1139 (Docket ## 37, 39); Drucker 5/20/10 Dep. pp. 18-19 (Docket # 41). Except for oral testimony that the University retains a licensing agent to license the color scheme on the University's behalf, there is no evidence of the existence of the license agreement(s). Thus, it is unclear whether the color scheme is licensed together with other trademarks of the University or how the University exercises control over the use of its Crimson and White color scheme.

[79] Opposers' Trial Brief p. 14.

color claim, the drawing of the mark is presumed to contemplate the use of the mark in any color. *See In re Data Packaging Corp.*, 453 F.2d 1300, 1302, 172 USPQ 396, 397 (CCPA 1972) and TMEP § 807.14(e)(i) (2012).

Even assuming applicants were to use their mark in red and white colors, there is no likelihood of confusion with the University's color scheme. The evidence shows the University has rights, if any, in the color scheme only when the colors are used directly in connection with goods and services provided or sponsored by the University – not to every conceivable use of a red and white color scheme in the state of Alabama.[80] Therefore, in order for applicants' mark to cause confusion with the University's color scheme as "used in connection with other trademarks or indicia of the University," applicant's HOUNDSTOOTH MAFIA and Design mark must be in red and white and be an indicia of the University. There is no evidence that the University has ever used the term "houndstooth mafia" or even the word "houndstooth" as a trademark or otherwise, and opposers have not established any

---

[80] The University filed four federal trademark applications making a narrow claim to the Crimson and White color scheme as embodied on helmets and jerseys. The University's applications for Crimson and White as applied to jerseys, Application Serial Nos. 85042,358 and 85975,049, were abandoned for failure to respond to the outstanding Final Office Actions of April 23, 2012, which refused registration, based on nondistinctiveness under §§ 1, 2, 3 and 45 of the Trademark Act, and insufficient evidence of acquired distinctiveness under § 2(f) of the Trademark Act. The applications for the Crimson and White color scheme as applied to helmets matured into registrations only after the examining attorney accepted the University's showing of acquired distinctiveness under § 2(f) of the Trademark Act. In support of its claim of acquired distinctiveness, the University submitted over 250 pages of evidence and claimed use of crimson and white on helmets in connection with its goods and services for over 40 years. See November 22, 2010 Responses to Office Action submitted in connection with the application that was divided and ultimately issued as U.S. Registration Nos. 3955150 and 4030682. By registering its Crimson and White color scheme under § 2(f), the University conceded lack of distinctiveness and therefore was required to prove acquired distinctiveness. *See In re Tires, Tires, Tires Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009) citing *In re MGA Entertainment Inc.*, 84 USPQ2d 1743, 1747 (TTAB 2007).

trademark rights in the Houndstooth Pattern. Therefore, the University's inclusion of its Crimson and White color scheme into its game plan for this opposition proceeding is quite simply, a "red herring." Applicants' HOUNDSTOOTH MAFIA and Design mark does not constitute an indicia of the University and therefore, even if it may be depicted in red and white colors, it is not likely to be confused with the University's Crimson and White color scheme.

To the extent the University contends applicants' use of the HOUNDSTOOTH MAFIA and Design mark in connection with a Crimson and White color scheme on apparel or in advertising deserves to be penalized, this is beyond the scope of the Board's jurisdiction and for courts to address.[81] *See Amsted Industries Inc.* v. *West Coast Wire Rope & Rigging Inc.*, 2 USPQ2d 1755, 1761 (TTAB 1987) (while an allegedly confusingly similar trade dress might give rise to a claim of unfair competition based on a collocation of all features, including the marks and the associated trade dress, such a claim is beyond the jurisdiction of the Board); *Stouffer Corporation* v. *Health Valley Natural Foods Inc.*, 1 USPQ2d 1900, 1905 (TTAB 1986); *Po Folks, Inc.* v. *Kountry Folks Restaurants, Inc.*, 231 USPQ 313, 315 (TTAB 1986) (the Board must resolve likelihood of confusion by reference to the marks of the parties as applied to restaurant services in the abstract, and must leave to the courts the claims, if any, plaintiff may have concerning trade dress infringement or unfair competition stemming from the alleged simulation of menus, restaurant decor, and the like).

---

[81] See Opposers' Trial Brief pp. 1, 18, 24, 31.

In view of the foregoing, whether applicants' mark is used in an infringing manner when it is placed on crimson and white hats or t-shirts is beyond the Board's jurisdiction. Accordingly, the federal court decisions urged by opposers involving the involved defendants' uses of the plaintiff-universities' color schemes and other identifying indicia are not pertinent to this proceeding.[82]

### (c) PAUL W. BRYANT MUSEUM & Design Marks

The University has also alleged that applicants' mark is likely to cause confusion with its common law use of the Houndstooth Pattern as a component of the following mark for the PAUL W. BRYANT MUSEUM and Design ("PAUL W. BRYANT MUSEUM & Design mark") for museum services and collateral products including apparel:[83]

---

[82] See Opposers' Trial Brief pp. 22-25 citing to *Bd. of Supervisors of the Louisiana State Univ. and Agric. & Mech. College* v. *Smack Apparel Co.*, 438 F. Supp. 2d 653 (E.D. La. 2006), *aff'd*, 550 F.3d 465 (5th Cir. 2008); *Texas Tech Univ.* v. *Spiegelberg*, 461 F. Supp. 2d 510 (N.D. Tex. 2006); *Univ. of Kansas* v. *Sinks*, 644 F. Supp. 2d 1287 (D. Kan. 2008).

[83] Further, the University has alleged that applicants' mark is likely to cause confusion with the mark shown in the previously registered Alabama State Trademark Registrations for the PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS and Design mark shown below:



In their trial brief at page 13, opposers identified the image of the PAUL W. BRYANT MUSEUM & Design mark as the mark contained in each of the University's Alabama State Trademark Registrations. However, a review of the Registrations attached to opposers' notice of reliance shows the mark that is actually covered in the State Registrations includes the term "Circle of Champions" in script as shown in this footnote. The University owns the following Alabama State Registrations issued on July 16, 1992 for the PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS and Design mark: Nos. 105-422 for: clothing namely, "jackets, shirts, ties, bibs, shoes, sweaters, caps, socks, etc." in Class 25;

47



Opposers have submitted images of web pages advertising the Paul W. Bryant Museum and various apparel and merchandise sold by the Museum, all bearing the PAUL W. BRYANT MUSEUM & Design mark.[84] Opposers' witness testified that the PAUL W. BRYANT MUSEUM & Design logo has been used since 1988 in connection with museum services and apparel. The logo has also been used on hats, t-shirts, shirts, infant one-piece outfits, lapel pins, bag clips, pens and pencils, plastic cups and key chains, and in connection with online retail store services.[85] This evidence is sufficient to establish the University's prior common law rights in the PAUL W. BRYANT MUSEUM & Design mark for museum services and apparel items. Inasmuch as the University has proven prior common law rights in the PAUL W. BRYANT MUSEUM & Design mark, we bring out the chains to measure for likelihood of confusion.

---

105-421 for: "seminars, tours, receptions, video tapes, lectures, and audio tapes," in Class 41; and 105-419 for: "brochures, posters, calendars, books, and advertising materials," in Class 16.

Inasmuch as ownership of state trademark registrations does not constitute evidence of common law trademark rights, the minimal evidence of use of the PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS and Design mark is insufficient to establish ownership of any common law rights in this mark.

[84] The Paul W. Bryant Museum opened on October 8, 1988, and is owned by the University and operated in collaboration with Bryant's estate. Gaddy Testimony Dep. pp. 7, 21 (Docket # 36).

[85] There is no testimony or evidence as to when the use on hats, t-shirts, shirts, infant one-piece outfits, lapel pins, bag clips, pens and pencils, plastic cups and key chains, and online retail store services first began. See Gaddy Testimony Dep. pp. 17-22, Exhibits 68-70 OPPS' NORT 1339-1355 (Docket # 36).

It is well established that marks must be compared in their entireties in determining likelihood of confusion. However, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re National Data Corp.*, 753 F.2d 1056, 1058 224 USPQ 749, 751 (Fed. Cir. 1985).

The literal element of applicants' mark, i.e., "Houndstooth Mafia," is a fanciful term that corresponds to the background houndstooth pattern shown in the mark.

In the PAUL W. BRYANT MUSEUM & Design mark, the literal portion of the mark corresponds to the image of Coach Bryant, reinforcing the meaning of the mark as relating to Coach Bryant.

As shown below, the only arguable shared element in the parties' marks is a peripheral patterned design:

          

However, any similarities end there as the patterned designs have different appearances, and are utilized in different manners in each mark. The pattern in applicants' mark is a houndstooth pattern as that term is defined above while the

pattern contained in the Museum mark is not the defined houndstooth pattern.[86] In the Museum mark, the pattern serves as the fabric of Coach Bryant's hat, while in applicants' mark it serves as a decorative background. The pattern is not a significant portion of the Museum mark and does not create a separate impression apart from the mark as a whole.[87] At most, the pattern in the PAUL W. BRYANT MUSEUM & Design mark reinforces the association between Coach Bryant and a patterned fedora. The secondary roles of the patterns in the parties' respective marks, together with the different appearances and manners in which it is used in each mark, are insufficient for us to find that the marks are similar in overall appearance or commercial impression.

When a composite mark contains both words and a design, the word portion is more likely to be impressed upon a purchaser's memory and to be used when requesting the goods and services. *See In re Viterra Inc.*, 671 F.3d 1358, 1362, 1366, 101 USPQ2d 1905, 1908, 1911 (Fed. Cir. 2012) citing *CBS Inc.* v. *Morrow*, 708 F.2d 1579, 1581-82, 218 USPQ 198, 200 (Fed. Cir. 1983). Considering the marks in their entireties, consumers will utilize the literal element of each mark in referring to the marks. They will not assume that the marks identify a single source or sponsor simply because applicant's mark includes the word "houndstooth" on a houndstooth

---

[86] There is no evidence showing that the pattern in the PAUL W. BRYANT MUSEUM & Design mark is identical to the houndstooth pattern in applicants' mark – and the patterns do not look the same to us.

[87] It is also unclear from the images of the mark provided by opposers that the pattern on the hat worn by Coach Bryant in the Museum mark is in fact a houndstooth pattern. The image of Coach Bryant shown on the Museum's website also does not appear to show him wearing a hat having a houndstooth pattern. Blackburn 3/31/09 Dep. Exhibit 6 OPPS' NOR 144 (Docket #29).

background while opposers' mark contains an image of Coach Bryant wearing a patterned fedora hat. Accordingly, viewing the marks in their entireties, we find that applicants' mark is not similar to the University's PAUL W. BRYANT MUSEUM & Design mark in sound, appearance, or commercial impression.

Opposers contend that applicants adopted their mark in bad faith with an intent to create an association with Coach Bryant and the University. Intent may, and ought to, be taken into account when resolving the issue of likelihood of confusion when that issue is not free from doubt. *Roger & Gallet S.A.* v. *Venice Trading Co.*, 1 USPQ2d 1829, 1832 (TTAB 1987). However, if confusion is not likely to result from the use of the marks, applicants' motives cannot affect their right to the registration sought. *See Shoe Corp. of America* v. *Juvenile Shoe Corp. of America*, 266 F.2d 793, 795, 121 USPQ 510, 512 (CCPA 1959) (evidence of intent may influence the ultimate question of likelihood of confusion, but is not necessarily controlling); *Boston Red Sox Baseball Club LP* v. *Sherman*, 88 USPQ2d 1581, 1593 (TTAB 2008); *Electronic Water Conditioners, Inc.* v. *Turbomag Corp.,* 221 USPQ 162, 165 (TTAB 1984). While applicants selected their mark because Alabama fans associate the Houndstooth Pattern with Coach Bryant's patterned fedora,[88] there is no evidence that applicants sought to confuse consumers as to the source or sponsorship of their products and, more importantly, applicants' HOUNDSTOOTH MAFIA and Design mark is not similar to any of opposers' asserted marks. Accordingly, applicants' intent in adopting their mark does not factor into our

---

[88] Blackburn 3/31/09 Dep. pp. 33-34 (Docket # 29).

likelihood of confusion determination with respect to the PAUL W. BRYANT & Design mark.[89]

In determining likelihood of confusion, we do not need to consider every *duPont* factor inasmuch as, "we are required only to consider those factors that are relevant." *Shen Mfg. Co.* v. *Ritz Hotel Ltd.*, 393 F.3d 1238, 1241, 73 USPQ2d 1350, 1353 (Fed. Cir. 2004) citing *Han Beauty, Inc.* v. *Alberto-Culver Co.*, 236 F.3d 1333, 1336, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001). Because the marks in their entireties are so dissimilar, evaluation of the remaining likelihood of confusion factors is not necessary. *Citigroup Inc.* v. *Capital City Bank Group, Inc.*, 637 F.3d 1344, 1355, 98 USPQ2d 1253, 1260 (Fed. Cir. 2011) *citing Kellogg Co.* v. *Pack'em Enterprises Inc.*, 951 F.2d 330, 333, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be

---

[89] As the Court stated in the case of *In re P. Ferrero & C.S.p.A.,* 479 F.2d 1395, 178 USPQ 167, 168 (CCPA 1973), "The fact that one mark may bring another mark to mind does not in itself establish likelihood of confusion as to source"; and the Board stated in *American Express Company v. Payless Cashways, Inc.,* 222 USPQ 907, 909 (TTAB 1984), "The concept of likelihood of confusion means more than the likelihood that the public will recall a famous or well known mark upon seeing the same or similar mark used by another. There must also be a reasonable basis for the public to attribute the particular goods and/or services of another to the source of the goods and/or services associated with the well known mark." That is, even if an applicants' mark might bring to mind the opposers' mark, this does not necessarily mean that consumers will be confused into believing that the two marks indicate the same source of origin.

Nor do we find bad faith with respect to any of the other alleged marks asserted by opposers inasmuch as there is no evidence that applicants sought to confuse consumers as to the source or sponsorship of their products. *See Fun-Damental Too, Ltd.* v. *Gemmy Industries Corp.*, 111 F.3d 993, 1005, 42 USPQ2d 1348, 1357 (2d Cir. 1997) ("Hence, in the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying. On the other hand, if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, we think the inference of bad faith may fairly be drawn to support a likelihood of confusion determination.").

dispositive."). Even if all of the remaining *duPont* factors are weighed in favor of opposers, this would be insufficient to overcome the substantial differences between the University's PAUL W. BRYANT MUSEUM & Design mark and applicants' HOUNDSTOOTH MAFIA and Design mark.

## F. Opposers' Section 2(a) Claims

We kickoff our discussion of opposers' § 2(a) claims for false suggestion of a connection and disparagement by noting the claims were pleaded and tried as separate claims rather than as alternative claims. The creation of a false suggestion of a connection results from the use of something that is consistent with the plaintiff's identity, while disparagement involves use of something inconsistent with the plaintiff's identity because it subjects a plaintiff to contempt or ridicule. If a mark is disparaging, it would seem unlikely that the public would reasonably believe a party would be "closely associated" with a mark that disparages itself. *Boston Red Sox Baseball Club LP* v. *Sherman*, 88 USPQ2d 1581, 1593 (TTAB 2008). Similarly, if a plaintiff proves that use of a term results in a false suggestion of a connection, it would seem unlikely that the same term would also be disparaging. Therefore, applicants' mark may either create a false connection with opposers or disparage them, but not both.

### 1. False Suggestion of a Connection

To prevail on their § 2(a) claim for false suggestion of a connection, opposers must prove: (1) applicants' mark is the same as or a close approximation of the University's or Coach Bryant's previously used name or identity; (2) applicants' mark would be recognized as such by purchasers, in that the mark points uniquely

and unmistakably to the University or Coach Bryant; (3) opposers are not connected with the goods and services that are sold or will be sold by applicants under their mark; and (4) that the University or Coach Bryant's name or identity is of sufficient fame or reputation that when applicants' mark is used on applicants' goods, a connection with the University or Coach Bryant would be presumed. *See University of Notre Dame du Lac* v. *J.C. Gourmet Food Imports Co.*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), *aff'g* 213 USPQ 594 (TTAB 1982); *Buffett* v. *Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985); *L. & J.G. Stickley Inc.* v. *Cosser*, 81 USPQ2d 1956 (TTAB 2007); *Boston Red Sox*, 88 USPQ2d at 1593.

In support of their false suggestion of a connection claim, opposers argue: (i) they have never licensed the Houndstooth Pattern or the Crimson and White color scheme to applicants; (ii) applicants' mark is a direct reference to the University and Coach Bryant because the mark includes the Houndstooth Pattern in its entirety, as well as the word "houndstooth;" and (iii) applicants admit their mark refers to Coach Bryant and that was their intent in adopting the mark. In making these arguments, opposers fail to show how the word "houndstooth" and the houndstooth pattern in applicants' mark closely approximate the identity of Coach Bryant or the University.

Evolving out of the rights of privacy and publicity, the false suggestion of a connection under § 2(a) of the Trademark Act was intended to preclude registration of a mark which conflicts with another's rights, even though not founded on the familiar test of likelihood of confusion. *Notre Dame*, 703 F.2d at 1376, 217 USPQ at

509. An opposer may prevail on the false suggestion of a connection ground when its right to control the use of its identity is violated, even if the name claimed to be appropriated was never commercially exploited by the opposer as a trademark or in a manner analogous to trademark use. *See Notre Dame*, 703 F.2d at 1375, 217 USPQ at 508; *Buffett*, 226 USPQ at 429. However, while a party's interest in its identity does not depend for its existence on the adoption and use of a technical trademark, a party must nevertheless have a protectable interest in a name (or its equivalent). Thus, we focus on the key factor in the false suggestion analysis for this case: whether applicants' mark is a close approximation of opposers' name or identity, i.e., a right in which opposers possess a protectable interest.[90]

### (a) Whether applicants' mark closely approximates the identity of Coach Bryant or the University

Because "houndstooth" and "houndstooth mafia" are not the "names" of either opposer or Coach Bryant, we consider whether applicants' mark is the same as or a close approximation of their "identity."

There is no evidence that the University has ever used the word "houndstooth" or the term "houndstooth mafia." Nor is there any evidence the University is known by a name that includes the word "houndstooth." While courts have recognized that "nicknames of trademarks or names used only by the public give rise to protectable rights in the owners of the trade name or mark which the public modified," *Dallas Cowboys Football Club, Ltd.* v. *America's Team Properties, Inc.*, 616 F. Supp. 2d 622, 633, 92 USPQ2d 1325, 1330 (N.D. Tex. 2009) citing *Nat'l*

---

[90] If opposers' false suggestion claim fails on this ground, the remaining factors are moot.

*Cable Television Assoc.* v. *Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1577, 19 USPQ2d 1424, 1428 (Fed. Cir. 1991), nothing in the record evidences use of "houndstooth mafia" (or any other term containing the word "houndstooth"), to refer to the University.[91]  This is in contradistinction to the situation present in *Board of Trustees of the University of Alabama* v. *BAMA-Werke Curt Baumann*, 231 USPQ 408 (TTAB 1986), where the University, having demonstrated that BAMA was its well-known nickname, prevailed on its claim for false suggestion of a connection under § 2(a) of the Trademark Act.  Here, there is no showing that "houndstooth" or "houndstooth mafia" has been used as a nickname by or for the University.

While § 2(a) does not require that a plaintiff commercially exploit its identity as a trademark, i.e., by applying it to goods or services sold in commerce, there clearly must be some public use or promotion of the asserted identity in a manner that provides a means of identifying the plaintiff.  *See, e.g.*, *Notre Dame*, 703 F.2d 1372, 217 USPQ at 509 ("a name cannot be protected in gross under § 2(a) any more

---

[91] Oddly, opposers rely on applicants' evidence to support media and fans' use of the term "Houndstooth Mafia" to refer to the University. (Opposers' Trial Brief p. 30).  However, a reading of the Internet passages and Internet search results cited by opposers does not support their contention.  *See* APP NOR 073-81 (Now that the Houndstooth Mafia has gone into hiding after their "I swear, I swear" forecasts of Spurrier to Alabama fell through . . .) and APP NOR-082-84 (At $4million a year how long will it take the Houndstooth Mafia to grow restless?  How soon will he have to defeat Auburn? . . . ) (Docket # 34).  Applicants testified these references do not refer to them, and they do not know who was being referred to in these passages.  It is not apparent that the foregoing references are to the University and, in fact, it appears that some references are not to the University but to the broader public that follows or maintains an interest in University of Alabama football.  Similarly, none of the uses of "Houndstooth Mafia" identified in the Internet search results contained in APP NOR 085-091 (Docket # 34) appear to identify the University.  The only relevant testimony about these passages is by applicant Pitts Jr. who testified that several of the references refer to applicants and were initiated by applicant Pitts who used "Houndstooth Mafia" as his "screen name."  See Pitts 3/21/2011 Dep. pp. 42-53 (Docket # 59).

than under § 2(d)"). There is no showing that the University used or promoted the Houndstooth Pattern, much less the word "houndstooth," in a manner that would constitute the University's identity.[92] The University's early use of a Houndstooth Pattern on football uniforms was undoubtedly in recognition of Coach Bryant's patterned fedora because at that time, his fedora was the only use of the pattern by either Coach Bryant or the University. Accordingly, there is no basis for us to conclude that either the literal or design component of applicants' mark closely approximates the University's identity.

While perhaps a closer question, there is also no basis for us to find that applicants' HOUNDSTOOTH MAFIA and Design mark closely approximates the identity or persona of Coach Bryant. Although he was not referred to by a name containing the word "houndstooth," applicants and the media associate Coach Bryant with a houndstooth fedora because he often wore a houndstooth fedora when coaching at the University's football games:

> March 31, 2009 Discovery Deposition of William Pitts, Jr. p. 19:[93]
>
> Q. So how did you come up with the phrase Houndstooth Mafia if it didn't have anything to do with Coach Bryant or the University of Alabama?
>
> A. Well, I mean, it could. I mean, I would say it did partly.
>
> p. 20

---

[92] The purpose of both the University's PAUL W. BRYANT MUSEUM & Design mark which contains an image of Coach Bryant wearing a patterned fedora, and the statue of Coach Bryant wearing a patterned fedora located outside the University's football stadium, were to commemorate Coach Bryant, not a means for the University to identify itself.

[93] Pitts 3/31/09 Dep. pp. 19, 32 (Docket # 29).

Q.      So it did partly come to you because of the connection to Coach Bryant and the university?

A.      Uh-huh.  Yes.  I'm sorry.

. . .

p. 32

Q.      All right.  Now, part of the Houndstooth Mafia trademark that we're here about today uses the word houndstooth and the houndstooth pattern; is that correct?

A.      Yes.

Q.      And it's true, is it not, that that design is a reference to the houndstooth hat that Coach Bear Bryant wore at Alabama football games?

A. Yeah.


March 31, 2009 Discovery Deposition of Christopher Blackburn p. 32[94]

Q.      And people wear the houndstooth apparel because they know that that's what Coach Bryant wore; is that right?

A.      I would – yes, sir.

Q.      And when you all designed your trademark, you selected a houndstooth pattern to be in the field behind the words Houndstooth Mafia; correct?

p. 33 (continued)

A.      Yes, sir.

Q.      You selected that houndstooth pattern because that was what Coach Bryant used to have on his hat; right?

A.      I selected it because that is the name of the logo, Houndstooth Mafia.

---

[94] Blackburn 3/31/09 Dep. pp. 32-37 (Docket # 29).

. . .

Q.    Isn't it true, Mr. Blackburn, that you selected the word Houndstooth as a part of your trademark because for Alabama fans Houndstooth is associated with Coach Bryant?

p. 34 (continued)

A.    You could assume that.  Yes.

Q.    I don't want to assume it.  You're under oath.  Is it true?

A.    Was that the only reason, no, sir.  That's not the only reason.

Q.    Was it one of the reasons?

A.    It was one of the reasons.  Yes.

Q.    And is that also one of the reasons that you selected the houndstooth pattern to be behind the letters in the logo?

A.    The pattern was selected to go - - to coincide with the words, with the verbiage.

The foregoing testimony shows that applicants' mark was adopted to tap into the affection that the University's football fans have for Coach Bryant by referencing the houndstooth fedora worn by Coach Bryant.  Although the evidence might well be viewed as establishing that a *patterned fedora* embodies the identity or persona of Coach Bryant, it does not establish that *a houndstooth pattern alone* (or with the word "houndstooth") embodies Coach Bryant's identity or persona.[95] Courts have long recognized that a person's rights, such as their right of publicity,

---

[95] Notably, the houndstooth fedoras sold by the University bear the University's "Stylized A" trademark in red.  Drucker 3/28/11 Dep. Exhibit 81 OPP NORT 1873 (Docket # 60).

extend beyond the use of their name or likeness, to the unauthorized use of their identity or persona. *See Carson* v. *Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 218 USPQ 1 (6th Cir. 1983) (defendant's use of "Here's Johnny" for toilets enjoined where phrase was used for years to introduce plaintiff-TV personality and was licensed for use on products) and *Motschenbacher* v. *R.J. Reynolds Tobacco Co.*, 498 F.2d 821 (9th Cir. 1974) (use of a photo of race car of a well-known professional race car driver having distinctive decorations on the car violated driver's right of publicity even though name and likeness were not used). However, we do not believe that the word "houndstooth" displayed on a background "houndstooth" pattern rises to the level of being "unmistakably associated with" Coach Bryant. *See Notre Dame,* 703 F.2d 1372, 217 USPQ at 509.

Past decisions have recognized that evidence of intent to suggest a connection with a person is relevant to false association claims under § 2(a). *See, e.g., Association pour la Defense et la Promotion de L'Oeuvre de Marc Chagall dite Comite Marc Chagall* v. *Bondarchuk,* 82 USPQ2d 1838, 1842-43 (TTAB 2007); *Notre Dame*, 217 USPQ at 507, 509; *Medtronic*, 204 USPQ at 325. However, the defendants in those decisions used the exact name or image of the target person or institution. Here, in contrast, applicants' mark is not the name or image of Coach Bryant, with his patterned fedora, nor does it contain his patterned fedora *per se*. The fact that applicants did not incorporate any of the foregoing in their mark diminishes the significance of their admission that they intended their mark, in

part, to "make[] reference to the houndstooth hat that Coach Bryant wore at Alabama football games."[96]

The *Boston Red Sox* case, where the defendant used the non-identical mark SEX ROD to parody plaintiff's RED SOX mark, recognized that the determination of whether the challenged mark is a "close approximation" of the identity of the target person under § 2(a) is a more stringent one, requiring a greater degree of similarity between the two designations. Indeed, the similarity required for a "close approximation" is akin to that required for a likelihood of confusion under § 2(d) and is more than merely "intended to refer" or "intended to evoke." In view of the foregoing, the accused mark must do more than simply "bring to mind" or, as in this case, "referencing" the hat worn by Coach Bryant. *See Boston Red Sox*, 88 USPQ2d at 1592-93, (despite the fact that applicant's mark was admittedly "intended to refer" and "intended to evoke" the opposer, applicant's mark is not a close approximation of opposer's identity, for the same reasons we found that the two marks are not similar for purposes of the likelihood of confusion analysis); 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:76 (4th ed. June 2013); *see also Notre Dame*, 703 F.2d 1372, 217 USPQ at 509 ("Thus, to show an invasion of one's 'persona,' it is not sufficient to show merely prior identification with the name adopted by another. . . . The mark . . .must point uniquely to the [opposer].").

---

[96] Pitts Jr. 3/31/09 Dep., Exhibit 16 OPPs' NOR 0252 (Docket # 29).

We therefore find the evidence does not establish that the mark, comprising the words HOUNDSTOOTH MAFIA displayed on a houndstooth-patterned background, closely approximates the identity or persona of Coach Bryant and, accordingly, cannot be "unmistakably associated" with Coach Bryant's identity or persona, nor does it "point uniquely" to him. We note that the term HOUNDSTOOTH MAFIA in applicants' mark is the dominant portion of the mark and significantly distinguishes applicants' mark from the patterned fedora-wearing Coach Bryant. The meanings of the words in applicants' mark, whether considered separately or more appropriately as a unitary term -- even together with the houndstooth pattern -- do not connote Coach Bryant, or any other person, but rather convey the identity of some kind of group. Thus, opposers have failed to prove that applicants' mark falsely suggests a connection with opposers.

### 2. Disparagement

Section 2(a) of the Trademark Act also prohibits registration of a mark that "consists of or comprises . . . matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). Opposers contend that applicants' mark is disparaging of opposers and brings them into contempt and disrepute because the word "mafia" refers to a criminal organization.[97]

In their main trial brief, opposers argue that the Board should apply the *Greyhound* test, arguing applicants' mark undeniably refers to the University and

---

[97] Opposers' Trial Brief p. 45; Opposers' Reply Brief p. 20.

Coach Bryant and is offensive to a reasonable person of ordinary sensibilities. *See Greyhound Corp.* v. *Both Worlds Inc.*, 6 USPQ2d 1635, 1639 (TTAB 1988). Conversely, applicants contend that the proper test is actually set forth in *Lebanese Arak Corp.*[98] The question of the appropriate test to apply requires an evaluation of the nature of the party alleging the claim. In the present case, each opposer, namely, the Board of Regents of the University of Alabama (an educational institution) and the son of Coach Bryant, acting on behalf of his estate (an individual), has argued that registration of applicants' mark would cast doubt on their commercial interests.[99] Thus, we find that the appropriate test to apply to an allegation of disparagement of a commercial entity is that found in *Greyhound* where the Board set forth the two elements of a commercial disparagement claim: 1) that the communication reasonably would be understood as referring to the plaintiff; and 2) that the communication is disparaging, that is, would be considered offensive or objectionable by a reasonable person of ordinary sensibilities. *Greyhound*, 6 USPQ2d at 1639.

**(a) Whether the Communication Reasonably Would be Understood as Referring to the Opposers**

The first prong of the *Greyhound* test requires a determination of whether applicants' mark would be understood as referring to opposers. This question

---

[98] In *In re Lebanese Arak Corp.*, the Board restated the test for disparagement where the party alleging disparagement is the member of a non-commercial group, such as a religious or racial group. *In re Lebanese Arak Corp.,* 94 USPQ2d 1215 (TTAB 2010).

[99] *See, e.g.*, Opposers' Trial Brief pp. 45-46 where opposers indicate they "strive to preserve the esteemed reputations of the University and Coach Bryant through the selective licensing of their marks" and complain "[A]pplicants' disparaging use of Opposers' Marks is precisely the type of use that Opposers aim to prevent through their licensing programs."

implicitly requires us to engage in an analysis to determine the meaning, i.e., the commercial impression, of applicants' mark. Once we have established the meaning and commercial impression of the mark, we must then determine whether that commercial impression refers to either the University or Coach Bryant.

Opposers argue that applicants' mark undeniably, unambiguously, and unequivocally refers to the University and Coach Bryant.[100] Opposers point to applicants' intent in adopting the HOUNDSTOOTH MAFIA and Design mark to refer to Coach Bryant and the University, the presence of a houndstooth pattern, as well as the word "houndstooth," as evidence that applicants' mark directly references opposers. Opposers' approach assumes that the presence of a houndstooth pattern or the word "houndstooth" in applicants' mark would be immediately associated with opposers and places too great an emphasis on applicants' intent in "referencing" Coach Bryant's patterned fedora. While Coach Bryant is strongly associated with a houndstooth fedora, there is no evidence showing that either the Houndstooth Pattern or the word "houndstooth" directly and unequivocally refer to Coach Bryant.

Opposers and applicants have glossed over the definition of the term "houndstooth," the first word in applicants' mark, focusing instead on the meaning of the word "mafia." As noted above, "houndstooth" is defined as "a pattern of broken or jagged checks used on a variety of fabrics." On its face, this term as used in applicants' mark does not to refer to anything but the actual textile pattern.

---

[100] Opposers' Trial Brief p. 44.

Both opposers and applicants rely upon the definition for "mafia" from the *American Heritage Dictionary* submitted by opposers:

> [1] A secret criminal organization operating mainly in the United Sates and Italy and engaged in illegal activities such as gambling, drug-dealing, protection, and prostitution. [2] Any of various similar criminal organizations, especially when dominated by members of the same nationality. [3] A secret criminal organization operating mainly in Sicily since the early 19th century and known for its intimidation of and retribution against law enforcement officials and witnesses. [4] often mafia *Informal.* A tightly knit group of trusted associates, as of a political leader.[101]

Opposers center their attention on the first three definitions, which define "mafia" as organized crime, while applicants focus on the fourth informal definition, which defines "mafia" as a tightly knit group of trusted associates.

Applicants submitted additional definitions of "mafia" as:

> "a commercial organization that purchases various journalist items, such as articles, columns or comic strips for their individual creators, and who sells them to newspapers or other periodicals for simultaneous publication over a wide area,"

> "an association of persons officially authorized to undertake some duty or to negotiate some business; also an association of persons who combine to carry out, on their own account, a financial or industrial project; as, a syndicated banker's form to take up and dispose of an entire issue of government bonds,"

> "any small, powerful or influential group in an organizational field; clique" and

---

[101] Opposers' Notice of Reliance, Exhibit M, *The American Heritage Dictionary of the English Language.* 4th Edition, pp. 366-368, OPPS' NOR 342-344 (Docket # 29).

"any tightly knit group of trusted associates having strong control or influence in some areas."[102]

Applicants also argue that they use the term HOUNDSTOOTH MAFIA to refer to a group of guys that Mr. Blackburn hangs out with that are fans of a number of different collegiate football teams.[103]

While we appreciate that the term "mafia" may refer to organized crime, we do not find this meaning present given the context of applicants' mark. We cannot conclude on this record that consumers would reasonably associate organized crime with the University or Coach Bryant, especially when there is a much more plausible meaning for "mafia," which does not have the allegedly disparaging connotation advanced by opposers. There simply are no facts whatsoever in this record that suggest that those familiar with Coach Bryant would choose the derogatory meaning of "mafia" and infer that either the University or Coach Bryant is a member of, or has ties to, organized crime.

### (b) Whether the Communication Would be Considered Offensive or Objectionable by a Reasonable Person of Ordinary Sensibilities.

Given that opposers do not meet the first prong of the *Greyhound* test, it is not necessary to determine whether applicants' mark would be considered offensive or objectionable by a reasonable person of ordinary sensibilities. However, even if applicants' mark is reasonably understood as referring to one or both of the

---

[102] Applicants' Notice of Reliance, Exhibit G, *The Collaborative International Dictionary of English* APP NOR 69-71 (Docket # 34).

[103] Blackburn 3/31/09 Dep. pp. 37-38 (Docket # 29).

opposers, a reasonable person of ordinary sensibilities would not consider applicants' mark offensive or objectionable.

To determine whether applicants' mark would be considered offensive or objectionable, we must consider the overall commercial impression of applicants' mark by viewing the likely meaning of the matter in question and taking into account not only the dictionary definition, but also the relationship of the matter to the other elements in the mark, as well as the nature of the goods and the manner in which the mark is used in the marketplace.

There is no evidence that the term "houndstooth mafia" is a term that has been used in a negative manner or in any manner, other than by applicants. Additionally, "mafia" has a positive definition that is not related to organized crime. The houndstooth pattern in applicants' mark, which is a well-known fabric design, imparts a more light-hearted connotation to the mark that is inconsistent with organized crime. In view of the incongruous nature of applicants' HOUNDSTOOTH MAFIA and Design mark, the mark would not be offensive to a reasonable person of ordinary sensibilities when used on applicants' apparel items. We note that our interpretation of applicants' mark is consistent with the Board's past analysis of the term "mafia" in the mark MEMPHIS MAFIA where the combination of "Memphis" and "mafia" was not found to be offensive or objectionable to individuals of Italian-American descent in the absence of evidence to the contrary.[104] Based on the

---

[104] *Order Sons of Italy in America* v. *The Memphis Mafia Inc.*, 52 USPQ2d 1364, 1369 (TTAB 1999).

foregoing, applicants' mark is not offensive or objectionable and is not disparaging under § 2(a).

## G.    Conclusion

In view of opposers' failure to show acquired distinctiveness in their alleged Houndstooth Pattern mark, and the lack of similarity between applicants' mark and the PAUL W. BRYANT MUSEUM & Design mark and the Crimson and White color scheme, applicant's mark is not likely to cause confusion with any of opposers' alleged marks. While a houndstooth fedora is associated with Coach Bryant and the University's fans have an affection for a houndstooth pattern because of its use on Coach Bryant's fedora, opposers failed to introduce evidence showing that the Houndstooth Pattern functions as a source or sponsorship indicator for products sold or licensed by the University. Because there was no showing that applicants' applied-for mark closely approximates the identity or persona of either Coach Bryant or the University, the mark neither is unmistakably associated with Coach Bryant or the University, nor points uniquely to them. It therefore does not falsely suggest a connection with opposers. Lastly, in light of the incongruous connotation of applicants' mark given its context, the mark is not disparaging.

**Decision:** The opposition is dismissed with prejudice and the application is remanded to the Examining Attorney for an evaluation of the issue related to registration of the mark discussed at footnote 1 *supra*.

# Appendix

## H. <u>The Record</u>

By operation of Trademark Rule 2.122, 37 CFR §2.122, the record includes the pleadings and the application file for applicants' mark, and the following:

### 1. Opposers' Evidence

Opposers submitted the following evidence in this proceeding via a Notice of Reliance submitted on June 1, 2010 (Docket # 29):

(a) A certified copy of the Alabama State Certificate of Registration of the mark PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS & Design, Registration Number 105-422, for clothing namely, "jackets, shirts, ties, bibs, shoes, sweaters, caps, socks, etc." in Class 25, registered on July 16, 1992, owned by the Board of Trustees of the University of Alabama;

(b) A certified copy of the Alabama State Certificate of Registration of the mark PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS & Design, Registration Number 105-421, for "seminars, tours, receptions, video tapes, lectures, and audio tapes," in Class 41, registered on July 16, 1992, owned by the Board of Trustees of the University of Alabama;

(c) A certified copy of the Alabama State Certificate of Registration of the mark PAUL W. BRYANT MUSEUM CIRCLE OF CHAMPIONS & Design, Registration Number 105-419, for "brochures, posters, calendars, books, and advertising materials," in Class 16, registered on July 16, 1992, owned by the Board of Trustees of the University of Alabama;

(d) A true and correct copy of the U.S. Patent and Trademark Office file for the application to register the Crimson and White Helmet Design mark, Serial No. 85/042,346[105], for "paper articles, namely, athletic programs, event programs, media guides, press guides, school yearbooks, posters, athletic schedules, game tickets; brochures, newsletters, magazines, and pamphlets in the field of topics of general interest to university students, fans, and alumni" in Class 16, "helmets" in Class 25, and "entertainment and educational services, namely, providing courses of instruction at the university level; educational research; arranging and conducting athletic competitions, events, tournaments, and exhibitions" in Class 41, filed on May 19, 2010, owned by Board of Trustees of the University of Alabama;

(e) A true and correct copy of the U.S. Patent and Trademark Office application file for the application to register the Crimson and White Jersey Design mark, Serial No. 85/042,358, for "paper articles, namely, athletic programs, event programs, media guides, press guides, school yearbooks, posters, athletic schedules, game tickets; brochures, newsletters, magazines, and pamphlets in the field of topics of general interest to university students, fans, and alumni" in Class 16,

---

[105] On December 10, 2010, pursuant to the University's Request to Divide the Application, Serial No. 85/042,346 was divided into two applications, with International Class 25 (subsequently amended to International Class 9) and International Class 41 remaining in the parent application and International Class 16 transferred to the new child application. Serial No. 85/042,346 matured into U.S. Registration No. 4030682 on September 27, 2011, and covers "sports helmets" in International Class 9 and "Entertainment and educational services, namely, providing courses of instruction at the university level; educational research; arranging and conducting athletic competitions, events, tournaments, and exhibitions." The child application, Serial No. 85/975,048, matured into U.S. Registration No. 3955150 on May 3, 2011 and covers "Paper articles, namely, athletic programs, event programs, media guides, press guides, school yearbooks, posters, athletic schedules, game tickets; brochures, newsletters, magazines, and pamphlets in the field of topics of general interest to university students, fans, and alumni."

"jerseys" in Class 25, and "entertainment and educational services, namely, providing courses of instruction at the university level; educational research; arranging and conducting athletic competitions, events, tournaments, and exhibitions" in Class 41, filed on May 19, 2010, owned by Board of Trustees of The University of Alabama;[106]

(f) A true and correct copy of the March 31, 2009 discovery deposition of Applicant Christopher Blackburn and the accompanying Exhibits 1-13 ("Blackburn 3/31/09 Dep.");

(g) A true and correct copy of the March 31, 2009 discovery deposition of Applicant William Pitts, Jr. and the accompanying Exhibits 14-19 ("Pitts Jr. 3/31/09 Dep.");

(h) A true and correct copy of Opposers' First Set of Requests for Admissions served on February 4, 2009 and Applicants' Answers served on March 18, 2009;

(i) A true and correct copy of Opposer University of Alabama's First Set of Interrogatories served on February 4, 2009 and Applicants' Answers served on March 18, 2009;

(j) A true and correct copy of Opposers' Second Set of Requests for Admissions served on May 18, 2009 and Applicants' Answers served on June 5, 2009;

---

[106] U.S. Application Serial No. 85/042,358 was subsequently divided such that the goods in International Class 25 and International Class 41 remained in U.S. Application Serial No. 85/042,358, while the goods in International Class 16 were placed in U.S. Application Serial No. 85/975049. Both jersey configuration applications were abandoned on October 24, 2012 for failure to respond to the outstanding Final Office Actions of April 23, 2012.

(k) A true and correct copy of Opposer University of Alabama's Second Set of Interrogatories served on May 18, 2009 and Applicants' Answers served on June 5, 2009;

(l) True and correct printouts of the following printed publications, relevant to show the public's perception of the term "mafia," marked as Exhibit L (OPPS' NOR 0300 - 0341):

    i.    An article entitled "Anti-Gang Sweep Nets 6 Arrests," dated November 30, 2007, from the *Los Angeles Times*;

    ii.    An article entitled "Killing and Kidnapping — Its All in the Family," dated October 13, 2007, from the *Glove and Mail*;

    iii.    An article entitled "After Finally Admitting Killing, Man Finally Goes Free," dated June 13, 2007, from the *New York Times*;

    iv.    An article entitled "5 Acquitted in Death of 'God's Banker,'" dated June 7, 2007, from the *Chicago Tribune*;

    v.    An article entitled "Arrested Activist Aroused Suspicions," dated June 2, 2007, from the *Los Angeles Times*;

    vi.    An article entitled "Con-ventional Wisdom? Gangster, Bulger Bro Found Work as Teamsters," dated April 7, 2007, from the *Boston Herald*;

    vii.    An article entitled "W.Side 'Godfather' Guilty in Drug Ring," dated October 13, 2006, from the *Chicago Sun Times*;

    viii.    An article entitled "Judge Rubs Out Mob Cop Verdict," dated July 1, 2006, from the *New York Daily News*;

ix. An article entitled "Mob Cop Kid OK to Testify," dated June 14, 2006, from the *New York Post*;

x. An article entitled "For 2 Ex-Detectives, Life Terms and Tales of Grief," dated June 6, 2006, from the *New York Times*;

xi. A film review of "Excellent Cadavers," dated May 7, 2006, from the *New York Times*;

xii. An article entitled "Purported Gang Chief is Held on Meth Count," dated April 20, 2006, from the *Los Angeles Times*; and

xiii. An article entitled "Luck Finally Runs Out for Italy's Boss of Bosses," dated April 12, 2006, from the *Los Angeles Times*; and,

(m) A copy of the dictionary definition of the term "mafia" from *The American Heritage Dictionary of the English Language*, published by Houghton Mifflin, 2006.

Opposers also filed trial testimony of the following individuals, via respective Notice(s) of Filing Testimony:

(a) May 24, 2010 testimony of Paul W. Bryant Jr. and accompanying Exhibit 81 (OPPS' NORT 1569-1623), filed on August 4, 2010 (Docket # 35) ("Bryant Jr. Testimony Dep.");

(b) May 13, 2010 testimony of Ken Gaddy and accompanying Exhibits 49-70 (OPPS' NORT 1160-1355), filed on August 4, 2010 (Docket # 36) ("Gaddy Testimony Dep.");

(c) May 13, 2010 testimony of Finus Gaston and accompanying Exhibits 1-48 (OPPS' NORT 0345-1159), filed on August 4, 2010 (Docket ## 37-39) ("Gaston Testimony Dep.");

(d) May 20, 2010 testimony of Michael Drucker and accompanying Exhibits 71-80 (OPPS' NORT 1356-1568), filed on August 4, 2010 (Docket #41) ("Drucker 5/20/10 Dep.");

(e) March 21, 2011 rebuttal testimony of William Pitts Jr. (OPPS' NORT 1624-1691), filed on May 24, 2011 (Docket # 59) ("Pitts Jr. 3/21/11 Dep.");

(f) March 21, 2011 rebuttal testimony of Christopher Blackburn (OPPS' NORT 1692-1742), filed on May 24, 2011 (Docket # 59) ("Blackburn 3/21/11 Dep.");

(g) Exhibits 1-17 (OPPS' NORT 1743-2051) to the March 21, 2011 rebuttal testimony depositions of Christopher Blackburn and William Pitts Jr., filed on May 24, 2011 as (Docket # 59); and,

(h) March 28, 2011 rebuttal testimony of Michael Drucker and Exhibits 81-140 (OPPS' NORT 1793-2051), filed on May 25, 2011 (Docket # 60) ("Drucker 3/28/11 Dep.").

### 2. Applicant's Evidence

Applicants filed the following admissible evidence in this proceeding via a Notice of Reliance submitted on August 2, 2010:[107]

(a) Printout of the website *ehoundstooth.com* Exhibit A (APP NOR 001-014)

(Docket # 34);

---

[107] Applicants also submitted a Supplemental Notice of Reliance on October 5, 2010, which was excluded by the Board's Order of June 22, 2011.

(b) Printout of the website *houndstoothcondos.com* Exhibit B, (APP NOR 015-016, 021-025) (Docket #34);

(c) Printout of the website *hounstoothsportsbar.com* Exhibit B, (APP NOR 021-025) (Docket #34);

(d) Printout of the website *alabama.teamfanshop.com* Exhibit D (APP NOR 043-049) (Docket #34);

(e) Printout of the website *varsityvest.com* Exhibit D (APP NOR 050) (Docket #34);

(f) Printout of online article from *tidesports.com*, dated October 10, 2006, and entitled "Tide to don commemorative jerseys against Ole Miss" Exhibit D (APP NOR 051-056) (Docket #34);

(g) Copy of commentary found at *ballhype.com* noting that Bear Bryant did not wear houndstooth, with accompanying copies of various images of Bear Bryant wearing a plaid fedora Exhibit F (APP NOR 059-067) (Docket #34);

(h) Definition of the term "mafia" from the websites *dictionary.net/mafia* and *dictionary.reference.com/browse/mafia* Exhibit G (APP NOR 068-072) (Docket #34); and

(i) Copies of online references to the term "houndstooth mafia" Exhibit H (APP NOR 073-091) (Docket #34).

*****